**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

OCIMUM BIOSOLUTIONS (INDIA)　　)
LIMITED and Don A. Beskrone,　　　)
Chapter 7 Trustee of　　　　　　　　)
OCIMUM BIOSOLUTIONS INC.,　　　)
　　　　　　　　　　　　　　　　)
　　　Plaintiffs,　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　v.　　　　　　　　　　　　　　)　　Civil Action No. 19-2227-MN
　　　　　　　　　　　　　　　　)
LG CHEMICAL LTD., ABION, INC.,　　)
and GENCURIX, INC.,　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　Defendants.　　　　　　　　)

## REPORT AND RECOMMENDATION

In the operative Second Amended Complaint ("SAC") in this case, Plaintiffs Ocimum Biosolutions (India) Limited and Don A. Beskrone, Chapter 7 Trustee of Ocimum Biosolutions Inc. (collectively, "Plaintiffs") bring a breach of contract claim (in Count I) against Defendant LG Chemical Ltd. ("LG Chem"), and misappropriation of trade secrets claims (in Counts II and III) against LG Chem and additional Defendants Abion, Inc. ("Abion") and Gencurix, Inc. ("Gencurix" and collectively with Abion, "A&GC"). Pending before the Court are: (1) LG Chem's motion to dismiss the SAC (the "LG Chem motion to dismiss"); and (2) A&GC's motion to dismiss the SAC (the "A&GC motion to dismiss") and to strike (the "A&GC motion to strike," and together with the LG Chem motion to dismiss and the A&GC motion to dismiss, the "Motions")). (D.I. 96; D.I. 101) For the reasons set forth below, the Court recommends that the LG Chem motion to dismiss be GRANTED-IN-PART and DENIED-IN-PART, and that the A&GC motion to dismiss be GRANTED. A&GC's motion to strike is DENIED as MOOT.

## I.　　BACKGROUND

A.    **Factual Background**

1.    **The Parties and Relevant Non-parties**

Plaintiff Ocimum Biosolutions (India) Limited ("Ocimum") is an entity organized and existing under the laws of India with a place of business in Hyderabad, India.  (D.I. 90 (hereinafter, "SAC") at ¶ 1)  Plaintiff Don A. Beskrone is the Chapter 7 trustee for the estate of Ocimum Biosolutions, Inc. ("Ocimum USA"), Ocimum's U.S. subsidiary, and a debtor under chapter 7 of title 11 of the United States Code.  (*Id.* at ¶¶ 2, 70)  Non-party Gene Logic was a Delaware corporation; its genomics division was purchased by Ocimum and Ocimum USA on October 14, 2007.  (*Id.* at ¶¶ 20, 70)  Gene Logic developed a genetic biological database called GeneExpress (the "GeneExpress Product"), which it licensed to drug companies for the purpose of streamlining testing in the pharmaceutical development process.  (*Id.* at ¶ 17)

Defendants LG Chem, Abion and Gencurix are, respectively, each South Korean corporations with principal places of business in Seoul, Korea.  (*Id.* at ¶¶ 3-5)  Neither Abion or Gencurix are current or former licensees of Ocimum or its predecessor, Gene Logic.  (*Id.* at ¶ 135)

2.    **Relevant Agreements**

On October 15, 2000, Gene Logic and LG Chem entered into an Agreement, referred to herein as "the Access Agreement."  (*Id.* at ¶ 18)  Pursuant to the Access Agreement, LG Chem gained access to the GeneExpress Product, comprising, *inter alia*, the "Oncology Datasuite" and certain Gene Logic software, which are alleged to be trade secrets.  (*Id.* at ¶¶ 18, 49-50)[1]

---

[1]    The Access Agreement is attached as Exhibit A to the SAC, (SAC, ex. A), and is to be construed and interpreted under the laws of the State of Delaware, (SAC at ¶ 48).

On or about December 6, 2002, Gene Logic sent a termination letter (the "termination letter") to LG Chem.  (*Id*. at ¶ 26)  The termination letter was consistent with Gene Logic's corporate-wide termination procedures that it followed with customers who did not renew their license.  (*Id*. at ¶ 27)  The termination letter stated in part:

> Pursuant to Section 5.2 (a) of the [Access Agreement], access to the GeneExpress[] Product (Oncology DataSuite and the Gene Logic[] Software) is limited to the term of the agreement. Accordingly, pursuant to Section 7.1 (c), please ship the GeneExpress[] Product (all system and data disks containing Gene Logic's oncology data and all software programs, including any APIs) back to my attention by January 15th.  Additionally, please destroy or erase all Gene Logic[] data on CD[s], hard disks, or tapes that were created or transferred to LG Biomedical Institute during the Term that contain the Oncology data and provide a letter to me certifying such destruction by January 15th.

(*Id.* at ¶ 26)  The termination of the Access Agreement required LG Chem to stop using Gene Logic's proprietary data and it required LG Chem to transfer all the data it had been accessing back to Gene Logic, so that this data could no longer be accessed and used.  (*Id.* at ¶ 28)  The Access Agreement in fact terminated on December 31, 2002.  (*Id.* at ¶ 25)

On January 15, 2003, employees of LG Chem and Gene Logic had a meeting in Gaithersburg, Maryland; LG Chem employee Dr. Sang Seok Koh attended the meeting on behalf of LG Chem.  (*Id.* at ¶ 29)  During this meeting, the companies discussed the "GeneExpress[] Database Wrap Up" and "LG Chem provided repeated assurances, through its statements and conduct, to Gene Logic that LG Chem had complied with its contractual termination obligations and had returned or destroyed all required information as requested in the December 6, 2002 termination letter."  (*Id.* at ¶¶ 29-30)  Plaintiffs allege, however, that despite these representations, "LG Chem secretly kept a copy of the Oncology Datasuite, which LG Chem continued to use long after the [Access] Agreement expired without paying the required access

fee to Gene Logic." (*Id.* at ¶¶ 31, 33)  Gene Logic was unaware that this occurred, and instead was led to believe that LG Chem had complied with its termination obligations.  (*Id.* at ¶¶ 42, 46)

On October 14, 2007, Ocimum and Ocimum USA executed an Asset Purchase Agreement with Gene Logic, whereby Plaintiffs purchased Gene Logic's genomics division.  (*Id.* at ¶ 70)  On December 17, 2007, Gene Logic and Ocimum USA executed an Assignment and Assumption Agreement, whereby Gene Logic assigned to Ocimum USA all rights, title, obligations, and interest in certain contracts to which Gene Logic was a party, including the Access Agreement.  (*Id.* at ¶ 74; D.I. 25, ex. 8)

In or around January 2019, Abion and Gencurix were assigned U.S. Patent No. 10,304,561 (the "'561 patent"), U.S. Patent No. 9,639,660 (the "'660 patent"), and patent application 16/129,206 (the "'206 application") from several persons/entities, including Seoul National University.  (SAC at ¶¶ 132, 180)

### 3.    Post-Transaction Publications

In 2007, several months before Plaintiffs acquired Gene Logic (and thus GeneExpress), Dr. Koh was one of several authors who published an article entitled "Expression profile of tight junction protein claudin 3 and claudin 4 in ovarian serous adenocarcinoma with prognostic correlation" (the "2007 Article").  (*Id.* at ¶ 82)  This article notes, *inter alia*, that "[e]xpression values of tumor and normal tissue biopsies were obtained from the GeneExpress Oncology Datasuite[] of Gene Logic Inc., based on the Affymetrix Human Genome U133 array set."  (*Id.* at ¶ 83)  LG Chem did not seek nor receive permission from Ocimum, or its predecessor Gene Logic, to publish the article.  (*Id.* at ¶ 85)

On August 22, 2012, LG Life Sciences, a then-affiliate of LG Chem (and an entity that later merged with LG Chem in or around 2017), filed U.S. patent application number 13/591,301

(the "2012 LG Life Sciences Application"); this application states that it relies on data from the GeneExpress Oncology Datasuite of Gene Logic.  (*Id.* at ¶¶ 93, 130)  LG Life Sciences did not seek consent from or provide notice to Ocimum before filing this patent application.  (*Id.* at ¶ 95)

On July 21, 2014, LG Life Sciences and several other entities including Seoul National University published an article titled "Newly Identified Cancer-Associated Role of Human Neuronal Growth Regulator 1 (NEGR1)."  (*Id.* at ¶ 102)  The article (the "2014 Article") stated, *inter alia*, that "[t]he expression values of tumor biopsies and normal tissues were obtained by analyzing GeneExpress Oncology Datasuite[] from Gene Logic (Gaithersburg, USA)[.]"  (*Id.* (internal quotation marks omitted)).  LG Life Sciences did not seek consent from or provide notice to Ocimum before publishing the article.  (*Id.* at ¶ 104)

Near the time of the publication of the 2014 Article, Seoul National University R&DB Foundation (the "Foundation") filed U.S. patent application 13/631,279 (the "'279 Foundation Application"), which stated that:

> [I]n order to search for candidate housekeeping genes (HKG) whose expression is maintained on similar levels in most tissues, first, datasets were constructed using EST and SAGE human gene expression data collected from the publicly available CGAP site (The Cancer Genome Project, http://cgap.nci.nih.gov/) and microarray gene expression data obtained from the GeneExpress Oncology Datasuite[] of Gene Logic Inc., based on the Affymetrix Human Genome U133 array set.

(*Id.* at ¶ 107)  The '279 Foundation Application claims priority to a Korean patent application filed on December 27, 2006, which includes the same reference, quoted above, to the Oncology Datasuite.  (*Id.* at ¶ 108)  Neither LG Chem nor Seoul National University sought or obtained permission from Ocimum before filing this application.  (*Id.* at ¶ 113)

On January 10, 2019, the '206 application was published as U.S. Patent Publication 2019/0012429 "in the name of" Abion and Gencurix; it too stated reliance on data from the

GeneExpress Oncology Datasuite of Gene Logic. (*Id.* at ¶¶ 132-33, 147-50)  LG Chem employee Dr. Koh is a named inventor on this patent. (*Id.* at ¶ 132)

Additional relevant factual allegations will be discussed below in the appropriate portions of Section II.

### B.    Procedural Background

On December 5, 2019, Ocimum filed the initial Complaint in this case; in that pleading, the Defendants included LG Chem, LG Life Sciences and two other entities (LG Corp. and LG Chem Life Sciences Innovation Center, Inc.). (D.I. 2)  LG Corp. and LG Life Sciences were later dismissed voluntarily from the case. (D.I. 14)

On March 11, 2021, United States District Judge Maryellen Noreika issued a Memorandum Opinion (the "March 11, 2021 MO") granting the then-current Defendants' motion to dismiss. (D.I. 46; D.I. 47)  On March 23, 2021, Plaintiffs filed a First Amended Complaint, which now named only the three current Defendants. (D.I. 48)  And on December 17, 2021, Plaintiffs filed the operative SAC. (D.I. 90)[2]

As was noted above, the SAC contains three causes of action:

- Count I:  Breach of contract—i.e., breach of the Access Agreement—against LG Chem. (SAC at ¶¶ 186-200)

- Count II:  Misappropriation of trade secrets under the Delaware Uniform Trade Secrets Act ("DUTSA") against all Defendants. (*Id.* at ¶¶ 201-16)

- Count III:  Misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") against all Defendants. (*Id.* at ¶¶ 217-26)

---

[2]    Plaintiffs had previously filed a prior version of the SAC, but this pleading was stricken by the Court. (*See* D.I. 88; D.I. 94)  Plaintiffs were subsequently given leave to file the operative version of the SAC. (*See* D.I. 89)

On January 21, 2022, LG Chem and A&GC filed the Motions.  (D.I. 96; D.I. 101)  On January 24, 2022, Judge Noreika referred the Motions to the Court for resolution.  (D.I. 103) Briefing was completed on the Motions on February 24, 2022.  (D.I. 116; 117)[3]

## II.    DISCUSSION

In the portions of their respective motions to dismiss that are filed pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants each argue, for various reasons, that each of Counts I-III should be dismissed.  The Court will address those Rule 12(b)(6) arguments first. Next, the Court will take up the portion of A&GC's motion to dismiss in which they argue, pursuant to Federal Rule of Civil Procedure 12(b)(2), that the claims against them should be dismissed for lack of personal jurisdiction.  Lastly, the Court will address A&GC's motion to strike.

### A.    Defendants' Arguments for Dismissal Pursuant to Rule 12(b)(6)

#### 1.    Legal Standards Regarding Federal Rules of Civil Procedure 8, 9(b) and 12(b)(6)

The sufficiency of pleadings for non-fraud claims is governed by Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).

If a Rule 12(b)(6) movant asserts that the plaintiff's complaint fails to plead sufficient facts necessary to set out a plausible claim, then the reviewing court conducts a two-part

---

[3]    In their briefing, Plaintiffs argue that LG Chem's opening brief was untimely filed (it was filed 12 minutes late due to technical issues), and that its motion to dismiss must be denied on that basis.  (D.I. 108 at 6-7)  The Court has previously addressed this issue via a February 17, 2022 Order, in which it:  (1) granted LG Chem's motion for a post-filing extension of time to file its opening brief; and (2) explained why Plaintiffs' decision to make this request for dismissal showed incredibly poor judgment.  (D.I. 114)  It will not further address the issue here.

analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Id.* at 210-11. Second, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).[4] In assessing the plausibility of a claim, the court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Id.* at 210 (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

However, with regard to a claim alleging fraud or mistake, there a plaintiff must meet the more stringent pleading requirements of Federal Rule of Civil Procedure 9(b). Fed. R. Civ. P. 9(b). Rule 9(b) mandates that the "circumstances constituting fraud or mistake" be "state[d] with particularity[.]" *Id.*; *see also Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). To do so, a party "must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200.

Sometimes, as here, a movant attempts to utilize a Rule 12(b)(6) motion in order to argue that a claim should be dismissed in light of the applicability of an affirmative defense. Under

---

[4] In resolving a motion to dismiss, a court typically considers the allegations in the complaint, the exhibits attached thereto, documents or facts that are incorporated by reference into the complaint or that are otherwise integral to the complaint's allegations, matters of public record and items for which the court can take judicial notice. *See Siwulec v. J.M. Adjustment Servs., LLC*, 465 F. App'x 200, 202 (3d Cir. 2012); *ING Bank, fsb v. PNC Fin. Servs. Grp., Inc.*, 629 F. Supp. 2d 351, 354 (D. Del. 2009). In their briefing, as will be further addressed below, the parties routinely cite to extra-record documents/facts that do not fall into any of these categories. To the extent they have done so, the Court has not considered those documents/facts herein in assessing Rule 12(b)(6) arguments for dismissal.

Rule 8, a complaint "need not anticipate or overcome affirmative defenses; thus, a complaint does not fail to state a claim simply because it omits facts" that would defeat an affirmative defense." *Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014). In other words, litigants need not "plead around" potential affirmative defenses. *Id.* at 252; *see also Wiggins v. Albert Einstein Med. Ctr.*, No. 20-3129, 2022 WL 1197015, at *2 (3d Cir. Apr. 22, 2022); *Moretti v. Hertz Corp.,* C.A. No. 14-469-LPS, 2017 WL 1032783, at *3 (D. Del. Mar. 17, 2017). That said, "[t]his principle does not categorically preclude courts from considering the application of an affirmative defense at the pleading stage." *Moretti*, 2017 WL 1032783 at *3. Indeed, courts may grant a Rule 12(b)(6) motion in light of an affirmative defense, but only where "the affirmative defense clearly appears on the face of the pleading." *Frasier-Kane v. City of Phila*., 517 F. App'x 104, 105 n.1 (3d Cir. 2013) (internal quotation marks and citations omitted); *see also DuBose v. Wyndham Vacation Resorts, Inc.,* Civil Action No. 20-1118-CFC, 2021 WL 3145206, at *2 (D. Del. July 26, 2021); *Moretti*, 2017 WL 1032783 at *3.

### 2.    Discussion

Having set out the relevant legal standards, the Court will now address Defendants' Rule 12(b)(6) arguments as to Counts I, II and III in turn.

### a.    Count I (Breach of Contract)

With Count I, Plaintiffs bring a breach of contract claim, pursuant to Delaware law, against only LG Chem. Under Delaware law, a plaintiff states a breach of contract claim by alleging facts supporting the following elements: (1) the existence of a contract, whether express or implied; (2) the breach of an obligation imposed by that contract; and (3) resultant damages to the plaintiff. *Pharm. Corp. of Am. v. Askari*, C.A. No. 16-1123-RGA-MPT, 2018 WL 2108200, at *5 (D. Del. May 7, 2018); *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 883 (Del. Ch.

2009).  Delaware law states that there is a three-year statute of limitations applicable to such

claims.  Del. Code Ann. Tit. 10, § 8106.  A breach of contract claim "accrues at the time of the

wrongful act, even if the plaintiff is ignorant of the cause of action."  *Erisman v. Zaitsev*, C.A.

No. 2020-0903-JRS, 2021 WL 6134034, at *12 (Del. Ch. Dec. 29, 2021) (internal quotation

marks and citation omitted).

In Count I, Plaintiffs allege that LG Chem breached the Access Agreement in various

ways, such as by:

- "[C]ontinuing to possess, have access to, and make use of the GeneExpress[] Product or technology derived therefrom, and its associated databases, after expiration of the [Access] Agreement[,]" (SAC at ¶ 191);

- "[R]evealing Plaintiffs' proprietary information to Chungnam National University, Seoul National University, Abion, Gencurix and other third parties without the knowledge or consent of Plaintiffs[,]" (*id.* at ¶ 194);

- "[S]haring results or other information derived from its usage of the GeneExpress[] Product with Chungnam National University, Seoul National University, Abion, Gencurix and other third parties without the knowledge or consent of Plaintiffs[,]" (*id.* at ¶ 195);

- "[A]llowing collaborators access to and use of Plaintiffs' proprietary information and information derived therefrom[,]" (*id.* at ¶ 196);

- "[A]llowing collaborators access to and use of results or other information derived from its usage of the GeneExpress[] Product[,]" (*id.* at ¶ 197), and;

- "[P]ublishing information regarding Ocimum's proprietary information without seeking or obtaining Plaintiffs' consent to do so[,]" (*id.* at ¶ 198).

With its Motion, LG Chem argues that Count I must be dismissed because an affirmative

defense is evident from the face of the SAC—namely, that Count I's allegations are time-barred.

(D.I. 102 at 5)  More specifically, LG Chem argues that because Plaintiffs filed suit on December 5, 2019, Plaintiffs must allege contractual breaches occurring after December 5, 2016 in order to avoid a time-bar; it asserts that Plaintiffs have failed to do so.  (*Id.*)

In responding, Plaintiffs make two arguments.  First, they argue that they have, in fact, alleged breaches of the Access Agreement that took place after December 5, 2016.  (D.I. 108 at 7)  Second, they argue that, with regard to any alleged breaches that occurred before this date, a tolling doctrine applies to those portions of the claim.  The Court will address both arguments in turn.

i.      **Pleading Post-December 5, 2016 Breaches of Contract by LG Chem**

With regard to Plaintiffs' first argument, it is not well taken.  In claiming that they alleged post-December 5, 2016 breaches by LG Chem, Plaintiffs initially point to paragraph 193 of the SAC; there, Plaintiffs simply stated that "LG Chem has breached the [Access] Agreement within three years of this lawsuit being filed and continues to breach the agreement still today." (SAC at ¶ 193 (*cited in* D.I. 108 at 7))  But that is simply a bald assertion, not a fact-based allegation.  And the Court is not obligated to accept such bald assertions as true.  *Chemtech Int'l, Inc. v. Chem. Injection Techs., Inc.*, 170 F. App'x 805, 808 (3d Cir. 2006); *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).

Otherwise, in attempting to find support for this argument, Plaintiffs cite not to the SAC, but instead to something that LG Chem wrote in a prior brief; according to Plaintiffs, in that brief, LG Chem "admit[ted] that it transferred Ocimum's technology to Abion and Gencurix on or about June 21, 2018."  (D.I. 108 at 7 (citing D.I. 51 at 9))  In fact, in this LG Chem brief

11

(which was filed back in April 2021), LG Chem stated only that "Abion and Gencurix . . . . acquired" the '206 application "after . . . December 5, 2016."  (D.I. 51 at 9)[5]

The Court does not see how this reference to content from a prior LG Chem brief can help Plaintiffs here.  For one thing, this prior brief is not the SAC, nor an exhibit attached to the SAC, or anything like that.  And so it is not a part of the record that a Court typically looks to for key facts necessary to resolution of a Rule 12(b)(6) motion.  But even putting that aside, the brief does not say that *LG Chem* was involved in this 2018 acquisition of the '206 application.  Nor is such a thing alleged in the SAC.  (*See* D.I. 116 at 2); *see also Chemtech Int'l, Inc.*, 170 F. App'x at 808 ("While a plaintiff may rely on the court to draw all reasonable inferences in his favor at the Rule 12(b)(6) stage, a plaintiff who relies on the court to fill in the blanks for all of the information missing in his complaint does so at his peril.").  Indeed, in the SAC, Plaintiffs alleged only that "Abion and Gencurix were assigned . . . the '206 application from several persons/entities including Seoul National University."  (SAC at ¶ 180)[6]

As far as the Court can tell, there is no mention in the SAC of *any* wrongful post-December 5, 2016 activity undertaken by LG Chem that amounts to a breach of the Access Agreement.  Most of the wrongful conduct described in the SAC that is attributed to LG Chem (or its employees or affiliates) dates either from the time period in *2003* just after the termination of the Access Agreement, (SAC at ¶¶ 30-37, 42-45), or relates to the publication of certain

---

[5]     The LG Chem brief does not say exactly when A&GC actually acquired that application, but it appears undisputed that this occurred in June 2018.  (D.I. 108 at 7; D.I. 116 at 2)

[6]     LG Chem asserts that, in fact, A&GC acquired the '206 application directly from individual inventors, not LG Chem.  (D.I. 108 at 7 & exs. 5-6; D.I. 116 at 2)

articles or applications in *2007-14*[7]—such as the 2007 Article, (*id*. at ¶¶ 82-87), or the 2012 LG Life Sciences Application, (*id*. at ¶¶ 93-97), or the 2014 Article, (*id*. at ¶¶ 102-04), or the '279 Foundation Application, (*id*. at ¶¶ 107-14).  As to all of those allegations, there cannot be any credible way to discern an assertion of breach occurring any time after 2014.

It is true that the SAC does go on to reference the publication of the '206 application in January 2019, which is of course a time period after December 5, 2016.  (*Id.* at ¶¶ 132-37, 144, 147-55)  But that application is not alleged to have been filed by LG Chem.  And when it comes to alleging a breach of contract by LG Chem that has anything to do with the '206 application, the SAC simply asserts that LG Chem would have breached the Access Agreement if it had disclosed protected material relevant to the '206 application to A&GC or to third parties "before *December 31, 2007* [in violation of] confidentiality provisions of [Section] 7.2 of the [Access] Agreement."  (*Id*. at ¶ 134 (emphasis added))  In other words, the SAC simply does not clearly allege a post-December 5, 2016 breach of contract by LG Chem that relates in any way to the '206 application.

---

[7]    Even as to these articles and applications, sometimes LG Chem's alleged breaches are asserted to have come much earlier than the actual date of publication.  For example, the latest of these articles/applications to be published was the '279 Foundation Application, which was filed in 2014.  (SAC at ¶ 107)  But LG Chem's alleged breach of the Access Agreement relating to this application is not clearly alleged to have come in 2014.  After all, the application's 2014 filer was the Foundation, not LG Chem.  (*Id.* at ¶ 107)  And although the SAC alleges that "[n]either LG Chem nor Seoul National University provided notice to Ocimum as required by [Section] 7.5 of the [Access] Agreement before filing [the '279 Foundation Application,]" (*id*. at ¶ 114), the SAC does not explain (and the Court does not currently understand) how LG Chem could be said to have violated Section 7.5 of the Access Agreement in 2014 if it was not the entity that filed the '279 Foundation Application in that year.  (*See id*., ex. A at § 7.5)  In the Court's view, the only clear allegation of breach in the SAC relating to this application comes in paragraph 110, where the SAC asserts that LG Chem is alleged to have breached the Access Agreement back on December 27, 2006—when Dr. Koh allegedly provided a copy of the Oncology Datasuite to the Foundation.  (SAC at ¶ 110)

In light of all of this, and after carefully reviewing all of the paragraphs of the SAC, the Court concludes that the most recent-in-time breach of contract that could possibly be attributed to LG Chem relates to the 2014 Article's publication on July 21, 2014 by LG Life Sciences (an entity that later merged with LG Chem).  (*Id.* at ¶¶ 102-04 (alleging that this is a violation of Section 7.5 of the Access Agreement))[8]  And so facially, the SAC's breach of contract allegations all appear to have accrued as of dates outside of the relevant three-year statute of limitations period.

### ii.    Pleading the Applicability of a Tolling Doctrine

This brings us to Plaintiffs' second argument:  that a tolling doctrine applies, such that the relevant statute of limitations was suspended.  Delaware courts[9] recognize three tolling doctrines:  (1) the doctrine of inherently unknowable injuries, (2) the doctrine of fraudulent concealment, and (3) the doctrine of equitable tolling.  *Ausikaitis ex rel. Masimo Corp. v. Kiani*, 962 F. Supp. 2d 661, 674 (D. Del. 2013) (citing *In re Tyson Foods*, 919 A.2d 563, 584-85 (Del. Ch. 2007)).  If a tolling doctrine applies, "the statute of limitations begins to run upon the

---

[8]    The Court did find one reference in paragraph 129 of the SAC as to how "[t]o the extent information contained in publications identified herein is not based on permissible use of information under the [Access] Agreement, on information and belief, LG Chem and other third parties who improperly obtained Plaintiffs' proprietary information from or through LG Chem continue to use this proprietary information still today in violation of the express and unambiguous terms of the [Access] Agreement."  (SAC at ¶ 129)  But the Court does not consider that to be a viable post-December 5, 2016 allegation of breach of contract because:  (1) the allegation is too vague and conditional (i.e., "[t]o the extent . . ."); (2) it is accompanied by no indication of the portion of the Access Agreement that has allegedly been breached; and (3) in their briefing, Plaintiffs do not cite to this paragraph as evidence of why their breach of contract allegations post-date December 5, 2016.

[9]    *See Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir. 1991) ("[S]tate tolling principles are generally to be used by a federal court when it is applying a state limitations period.") (internal quotation marks and citations omitted).

discovery of facts constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts." *Coleman v. PricewaterhouseCoopers, LLC*, 854 A.2d 838, 842 (Del. 2004) (internal quotation marks omitted) (emphasis in original). Accordingly, "no theory will toll the statute beyond the point where plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong." *In re Tyson Foods*, 919 A.2d at 585.[10]

Of the three tolling doctrines described above, Plaintiffs allege that they have pleaded sufficient facts to demonstrate the applicability of two of them: fraudulent concealment and equitable tolling. (D.I. 108 at 16) The Court need only address the first of these.

"Under Delaware law, fraudulent concealment tolls a statute of limitations where a defendant has done some affirmative act or acts involving 'actual artifice' which prevents a plaintiff from discovering the facts giving rise to his or her cause of action, 'or [where a defendant has made] some misrepresentation which is intended to put the plaintiff off the trail of inquiry.'" *Capricorn Pharma, Inc. v. Matrixx Initiatives, Inc.*, Civil Action No. 08-873-JJF, 2009 WL 2567022, at *4 (D. Del. Aug. 19, 2009) (quoting *Halpern v. Barran,* 313 A.2d 139, 143 (Del. Ch. 1973)). Therefore, to assert fraudulent concealment, Plaintiffs must allege that the

---

[10]        As was noted above, a plaintiff has no obligation to plead facts in its complaint that negate the existence of an affirmative defense. However, sometimes (as here) a complaint includes allegations that, on their face, indicate that a claim accrued outside of the relevant statute of limitations window. In that circumstance, our Court (relying on Delaware state law for this proposition) has held that the plaintiff bears the burden of pleading facts to support the applicability of a tolling doctrine. *See DuBose*, 2021 WL 3145206, at *4; *Marshal T. Simpson Tr. v. Invicta Networks, Inc.*, Civil Action No. 16-173, 2017 WL 4684325, at *7 (D. Del. Oct. 18, 2017); *see also In re OPP Liquidating Co., Inc.*, Case No. 19-10729 (MFW), 2022 WL 774063, at *4 (Bankr. D. Del. Mar. 14, 2022); (D.I. 46 at 12). Because Plaintiffs do not dispute that they bear this burden, (D.I. 108 at 16 ("Ocimum has pled bases to toll the limitations period") (emphasis omitted)), the Court will assume herein that this statement of the law is correct.

LG Chem "had actual knowledge of the wrong done and acted affirmatively in concealing the facts" from the plaintiff. *Ewing v. Beck*, 520 A.2d 653, 667 (Del. 1987).[11]

In asserting that they have sufficiently pleaded fraudulent concealment with particularity,[12] Plaintiffs point specifically to their allegations in paragraphs 26-46 of the SAC; these allegations describe LG Chem's actions after the Access Agreement was terminated. (D.I. 108 at 16-17)

Amongst these allegations are the following:

- After Plaintiffs' predecessor Gene Logic sent a termination letter regarding the Access Agreement to LG Chem in December 2002, on January 15, 2003, representatives from the two companies met. During this meeting, which Dr. Koh attended on behalf of LG Chem, "LG Chem provided repeated assurances, through its statements and conduct, to Gene Logic that LG Chem had complied with its contractual termination

---

[11]    "In addition to affirmative acts of misrepresentation, fraudulent concealment can involve the failure to disclose facts when there is [a] duty to disclose." *Capricorn Pharma, Inc.*, 2009 WL 2567022, at *4 (internal quotation marks and citation omitted). Fraudulent concealment can occur via a failure of disclosure only in limited circumstances, however, namely when one party is in a fiduciary relationship with another. *See Litman v. Prudential-Bache Props., Inc.*, Civ. A. No. 12137, 1994 WL 30529, at *4 (Del. Ch. Jan. 14, 1994); *Lecates v. Hertrich Pontiac Buick Co.*, 515 A.2d 163, 177 (Del. Super. Ct. 1986); *see also In re Fruehauf Trailer Corp.*, 250 B.R. 168, 186 (D. Del. 2000) ("[F]raudulent concealment may be established absent any affirmative act, by alleging a business fiduciary relationship between Defendants and Plaintiffs and a duty to disclose."). Plaintiffs do not allege that LG Chem had a fiduciary duty with regard to them or Gene Logic. However, Plaintiffs do assert that LG Chem had a *contractual duty* to notify them of the documents underlying this tolling defense, which Plaintiffs argue is sufficient under Delaware law to provide for the alternative path to demonstrating fraudulent concealment. (D.I. 108 at 17)  LG Chem disagrees with Plaintiffs' interpretation of the law in this regard. (D.I. 116 at 7)

The Court need not resolve this issue. Because the Court has concluded herein that Plaintiffs have plausibly asserted the applicability of the fraudulent concealment tolling doctrine by reference to affirmative acts, it need not look further for other ways as to which that doctrine might apply.

[12]    Facts relating to an allegation that a statute of limitations is tolled due to fraudulent concealment must be pleaded with particularity, pursuant to Rule 9(b). *Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620, 626-27 (3d Cir. 1984).

obligations and had returned or destroyed all required information as requested in the December 6, 2002 termination letter."  (SAC at ¶¶ 29-30)

- "Unknown to Gene Logic, however, this was not true, and LG Chem knew it.  In fact, at all times when it made these untrue representations and deceiving actions, LG Chem knew that (i) Gene Logic was seeking assurance that the Access Agreement was being followed, including termination protocols, and (ii) Gene Logic was relying on the written and verbal representations of LG Chem to refrain from enforcing its rights under the Access Agreement, which obligations expressly survived termination."  (*Id.* at ¶ 30)

- "LG Chem, including its employee, Dr. Koh, engaged in an affirmative act of concealment by affirming through its conduct and actions that LG Chem had erased or returned all copies of the Oncology Datasuite.  In fact, LG Chem secretly kept a copy of the Oncology Datasuite, which LG Chem continued to use long after the Access Agreement expired without paying the required access fee to Gene Logic."  (*Id.* at ¶ 31)

- "LG Chem furthered its active concealment by actually returning hard disks containing the Oncology Datasuite to Gene Logic,[] as requested by Gene Logic, which was an act solely intended to mislead Gene Logic, and make Gene Logic believe it had received everything in LG Chem's possession" when in fact that was not true.  (*Id.* at ¶ 32; *see also id*. at ¶¶ 33-36)

- LG Chem also returned a Sun Microsystems E450 server that had been provided by Gene Logic and that contained an entire copy of the Oncology Datasuite, and LG Chem affirmed that it had destroyed or erased all of Gene Logic's data that had been created or transferred to the location at which the server had been housed.  These acts were also intended to induce Gene Logic into believing that the termination process had been successfully completed, when in fact, it had not.  (*Id.* at ¶¶ 23, 38, 42)

The Court agrees with Plaintiffs that these facts plausibly establish the applicability of the fraudulent concealment tolling doctrine.  They amount to specifically-alleged, affirmative acts by LG Chem—acts that falsely assured Plaintiffs that LG Chem no longer had any version of the

17

Oncology Datasuite (and thus could no longer use that product). This, in turn, is said to have lulled Plaintiffs into a false sense of security—i.e., Plaintiffs were not aware of or on the lookout for contractual breaches by LG Chem in the future, because they believed (wrongfully, thanks to LG Chem's actions and misrepresentations) that no such breaches could possibly occur.

In arguing against this conclusion, LG Chem notes that the events listed above are said to have happened in and around *January 2003*, and that Plaintiffs have not otherwise "show[n] that LG Chem took any affirmative actions to prevent or dissuade Plaintiffs from discovering the multiple publications that issued in *2007* and continuing for years after." (D.I. 116 at 7 (emphasis in original); *see also id*. at 8) But the Court does not see why this fact is dispositive here. If LG Chem made affirmative misrepresentations in 2003 that effectively fooled Plaintiffs into thinking that LG Chem had complied with the Access Agreement and would no longer have the ability to utilize the Oncology Datasuite, then it stands to reason that the effect of those representations could—unless other events intervened—last quite a long time. Put differently, once Plaintiffs were misled by the alleged fraud, it seems plausible that they might well have remained misled for years.

Now, to be sure, the Court still must assess whether the pleaded facts otherwise indicate that, at some point between 2003 and 2017 (the year when Plaintiffs allege that they became aware of the publication of the 2007 Article, the 2012 LG Life Sciences Application, the 2014 Article and the '279 Foundation Application, each of which contained content that then alerted Plaintiffs to LG Chem's breaches of contract)[13] Plaintiffs, "exercising reasonable diligence,

---

[13]    (*See* SAC at ¶¶ 86-87, 89-90, 96-99, 105, 116-19) The Court notes that it would have been better had Plaintiffs pleaded some additional facts regarding *how*, exactly, they became aware of the four publications in 2017. But LG Chem does not point to that lack of detail as a reason to grant its motion to dismiss. And so the Court does not address it further here.

should have discovered the alleged injury." *Gen. Video Corp. v. Kertesz*, No. 1922-VCL, 2008
WL 509816, at *5 (Del. Ch. Feb. 25, 2008) (internal quotation marks and citation omitted).  If
Plaintiffs should have done so at some point prior to 2017, then any tolling of the statute of
limitations would cease at that point.  "Inquiry notice does not require a plaintiff to have actual
knowledge of a wrong, but simply an objective awareness of the facts giving rise to the wrong."
*Lion 2004 Receivables Tr. v. Long Term Preferred Care, Inc.*, C.A. No. 16-723-RGA-MPT,
2017 WL 1053100, at *6 (D. Del. Mar. 20, 2017) (internal quotation marks and citations
omitted), *report and recommendation adopted*, 2017 WL 3783258 (D. Del. Aug. 31, 2017).
Accordingly, "[i]n examining whether the plaintiff was on inquiry notice, the court determines
whether there were any red flags that clearly and unmistakably would have led a prudent person
of ordinary intelligence to inquire and if pursued, would have led to discovery of the elements of
the claim being asserted."  *Id.* (internal quotation marks, brackets and citations omitted); *see also*
*Machala v. Boehringer Ingelheim Pharms., Inc.*, C.A. No.: N16C-12-231-PRA, 2017 WL
2814728, at *6 (Del. Super. Ct. June 29, 2017).  The "critical inquiry" is thus whether Plaintiffs
were entitled to rely on LG Chem's representations for as long as they did.  *Lion 2004*
*Receivables Tr.*, 2017 WL 1053100, at *6 (internal quotation marks and citation omitted).

Obviously, if a prudent person of ordinary intelligence in Plaintiffs' shoes should have
gotten wind of the publication of the 2007 Article, the 2012 LG Life Sciences Application, the
2014 Article and/or the '279 Foundation Application (hereafter, the "four publications")[14] in or

---

[14]    The Court focuses herein on these four publications, in light of their significance
in the SAC.  LG Chem also notes that there were other related U.S. and foreign patent
applications or patents (some of which are also referenced in the SAC) that contain similar
references to Gene Logic or to the Oncology Datasuite.  (D.I. 102 at 2 & nn. 2-3; D.I. 116 at 1)
Although the Court will largely refer to the four publications herein, the logic of the Court's
decision would not change were the existence of some or all of these other patent
applications/patents taken into account.

around the time those articles/applications were published, then Plaintiffs' case for tolling would fall away.[15]  But Plaintiffs have pleaded sufficient facts to explain why they did not know about these documents—and why they should not have reasonably known about them—at or around the documents' respective publication dates.  Among those facts are that:

- LG Chem was just one of over 100 customers of Gene Logic/Plaintiffs, and during the relevant years, Gene Logic/Plaintiffs had no reason to believe that LG Chem was engaged in wrongdoing.

- Plaintiffs did not have any other interactions with LG Chem between 2003 and 2017 that might have prompted them to inquire about these issues.; and

- The four publications were just a few of millions of articles published or applications filed worldwide in those years, and Plaintiffs would not have had sufficient reason to search for those particular articles/applications amongst millions of others.

(*See, e.g.*, SAC at ¶¶ 87-89, 92, 97-98, 101, 106, 115-18)  These allegations bolster Plaintiffs' position.  They help to demonstrate why LG Chem—just one of a large number of former customers of Gene Logic/Plaintiffs, and one who did not reinsert itself into Gene Logic's or Plaintiffs' business dealings in the interval—would not necessarily have been on Plaintiffs' radar screen during these intervening years.  And they provide additional context as to why, during this

---

[15]     It appears to be disputed as to whether any of these four publications were publicly available (e.g., via the Internet) in or around the time of their alleged filing/publication. (D.I. 102 at 17-18; D.I. 108 at 10-11; D.I. 116 at 5 n.5)  Even assuming, however, that at least the patent applications (or the patents later resulting from them) were publicly available in this manner outside the limitations period, (D.I. 102 at 17-18; D.I. 116 at 5 n.5), there is no *per se* rule stating that simply because a patent application was publicly filed, that means that a reasonable person in Plaintiffs' shoes necessarily should have been on notice of the filing.  *See Lambda Optical Sols., LLC v. Alcatel-Lucent USA Inc.*, Civil Action No. 10-487-RGA-CJB, 2015 WL 5470210, at *8-9 (D. Del. Aug. 6, 2015), *report and recommendation adopted*, 2015 WL 5458273 (D. Del. Sept. 17, 2015); *Capricorn Pharma, Inc.*, 2009 WL 2567022, at *5, *7.

time period, Plaintiffs might not have been scouring the Internet for articles or patent

applications (assuming those publications were in fact available via the Internet) in some way

related to LG Chem.[16]

Of course, at the end of the day, it may turn out that the evidence as to whether Plaintiffs

acted with reasonable diligence will tip LG Chem's way.  The four publications do, after all,

---

[16]     In their briefing, the parties both discuss at some length the decision in *Capricorn Pharma, Inc. v. Matrixx Initiatives, Inc.*, Civil Action No. 08-873-JJF, 2009 WL 2567022 (D. Del. Aug. 19, 2009).  (D.I. 108 at 11, 16-17; D.I. 116 at 8-9)  In *Capricorn*, *inter alia*, the plaintiff brought breach of contract and trade secret misappropriation claims under Delaware law against the defendants, and the defendants moved to dismiss those claims on the ground that they were time-barred under the applicable three-year statute of limitations.  2009 WL 2567022, at *1-2.  Ultimately, the *Capricorn* Court concluded that the plaintiff had adequately pleaded the applicability of the fraudulent concealment doctrine, sufficient to overcome a motion to dismiss on statute of limitations grounds.

The facts in *Capricorn* are not on all fours with the facts here, and so in some ways, the case is not a great comparator.  For example, in *Capricorn*, the alleged period of time between when fraudulent concealment began and when the plaintiff became aware of the alleged misconduct was about five years (from 2003 to 2008), whereas here, that period of time is far longer.  *Id*. at *2.  And while here, LG Chem's alleged fraudulent acts of concealment occurred at the beginning of the tolling period in 2003, in *Capricorn*, there were a number of different acts of concealment that occurred throughout the five-year period in question.  *Id*. at *2, *6; *see also* (D.I. 116 at 8-9).

But in some ways, *Capricorn* is helpful to Plaintiffs.  For example, one of the facts that the *Capricorn* Court relied on was that during the tolled period in question, a defendant provided "affirmative assurances to" the plaintiff that it was abiding by its contractual responsibilities, when in fact this was allegedly false.  2009 WL 2567022, at *6 (internal quotation marks and citation omitted).  Similarly, here, Plaintiffs allege that LG Chem provided repeated false assurances in 2003 to Gene Logic that LG Chem had complied with its contractual termination obligations and had returned or destroyed all copies of the Oncology Datasuite.  (SAC at ¶¶ 29-31; D.I. 108 at 16-17)  Moreover, in *Capricorn* (like here), the defendants had asserted that because a patent application had been filed in 2004 that contained the trade secrets at issue, this should serve to extinguish the tolling period.  2009 WL 2567022, at *4.  Yet the *Capricorn* Court disagreed, noting that there was no *per se* rule in that regard, and that ultimately, in light of the relevant record, a reasonable person in the plaintiff's shoes would not necessarily have been aware of the filing of that patent application.  *Id*. at *4-7.  In the Court's view, *Capricorn* does not undercut Plaintiffs' argument regarding Count I; if anything, the case bolsters Plaintiffs' argument.

specifically identify "Gene Logic" and the "Oncology Datasuite" by name.  (D.I. 102 at 11-12)

And it could be (depending on what the evidence ultimately shows) that given the nature of

Plaintiffs' business—and even despite the alleged acts of fraudulent concealment—a prudent

person in Plaintiffs' place would have been regularly searching for any mention of those terms in

the public domain, and that such searching would have led to earlier discovery of the alleged

wrong.  (*Id.*)  But we are presently at the Rule 12(b)(6) stage—a point where the record is

necessarily more limited than it would be if the issue were further litigated later in the case.  And

with inquiry notice being a fact-intensive question, in these circumstances, it is "an issue on

which there ought to be discovery." *Lion 2004 Receivables Tr. v. Long Term Preferred Care,*

*Inc.*, C.A. No. 16-723-RGA, 2017 WL 3783258, at *2 (D. Del. Aug. 31, 2017); *see also MKE*

*Holdings Ltd. v. Schwartz*, C.A. No. 2018-0729-SG, 2020 WL 467937, at *13 (Del. Ch. Jan. 29,

2020) (concluding that plaintiffs had sufficiently pleaded facts demonstrating the applicability of

the fraudulent concealment doctrine, sufficient to toll the requisite statute of limitations, and

noting that certain defendants' arguments that plaintiffs were earlier on inquiry notice of the

purported scheme were best addressed on "a [more] developed record" later in the case, since

without further facts being of record, it was difficult to put defendants' arguments in proper

"context").[17]

     For these reasons, the Court recommends that LG Chem's motion to dismiss be DENIED

as to Count I.[18]

----

[17]    Since the Court has concluded that the fraudulent concealment tolling doctrine is
applicable here, and that it can plausibly serve to toll the relevant statute of limitations, the Court
need not address the parties' arguments regarding the applicability of the equitable tolling
doctrine as to Count I.  *See Lion 2004 Receivables Tr.*, 2017 WL 3783258, at *2.

[18]    The Court recognizes that in the March 11, 2021 MO, Judge Noreika concluded
that:  (1) Counts I-III were time-barred; and (2) Plaintiffs had not plausibly alleged that any

### b.      Count II (Misappropriation of Trade Secrets Under the DUTSA)

In Count II, Plaintiffs assert trade secret misappropriation under the DUTSA against all

three Defendants.  The Court will first address LG Chem's arguments for dismissal of this count,

and then will take up A&GC's arguments.

### i.      LG Chem

LG Chem argues that Count II should be dismissed as time-barred.  Under the DUTSA a

continuing violation constitutes a single claim of misappropriation.  Del. Code Ann. tit. 6, §

2006.  And claims under the DUTSA must be brought within three years after the

misappropriation "is discovered or by the exercise of reasonable diligence should have been

discovered."  *Id*.; *see also VLIW Tech., LLC v. Hewlett-Packard Co.*, No. Civ.A. 20069, 2005

WL 1089027, at *13 (Del. Ch. May 4, 2005).  "The key consideration under the discovery rule is

the factual, not the legal, basis for the cause of action."  *VLIW Tech., LLC*, 2005 WL 1089027, at

*13 (internal quotation marks and citations omitted).  As such, "[i]t does not matter if an

aggrieved party does not realize that the use legally constituted a misappropriation of

trade secrets [. . .] as long as the party knew *the facts* which could give rise to such a claim."  *Id.*

(internal quotation marks, citations, and brackets omitted) (emphasis in original).

For essentially the same reasons stated above in Count I as to why the SAC plausibly

alleges that the statute of limitations was tolled in light of the fraudulent concealment doctrine,

here the Court concludes that Plaintiffs have plausibly alleged that they could not have

---

tolling doctrine could serve to toll the relevant statutes of limitations.  (D.I. 46 at 12-13, 14)  But
the March 11, 2021 MO also noted that Plaintiffs' allegations in the then-operative complaint
regarding fraudulent concealment were minimal.  (*Id.* at 12)  Here, in contrast, it is the additional
level of detail in the SAC regarding this doctrine that creates a different record.  (*Id.* at 18
(District Court noting that it "cannot rule out that Ocimum could properly allege . . . tolling of
the statute of limitations" in a future pleading))

discovered, by the exercise of reasonable diligence, the trade secret misappropriations at issue before December 5, 2016.  Thus, Plaintiffs have pleaded facts plausibly asserting that Count II did not accrue as to the claim against LG Chem until 2017, such that the claim would not be time-barred.[19]

---

[19]    The parties both address the undersigned's decision in *Lambda Optical Sols., LLC v. Alcatel-Lucent USA Inc*., Civil Action No. 10-487-RGA-CJB, 2015 WL 5470210 (D. Del. Aug. 6, 2015).  (D.I. 108 at 11-12; D.I. 116 at 9)  The Court agrees with Plaintiffs that the facts in *Lambda* are not similar to the facts here (for additional reasons beyond the reality that, unlike here, *Lambda* was decided at the summary judgment stage).  And it thus concludes that the outcome in *Lambda* supports Plaintiffs' position, not LG Chem's position.  (D.I. 108 at 11-12)

In *Lambda*, at issue was a New Jersey state law claim for trade secret misappropriation; as here, the New Jersey claim accrued when the misappropriation was discovered, or by exercise of reasonable diligence should have been discovered.  2015 WL 5470210, at *8.  In *Lambda*, a patent containing the alleged trade secrets was published by the predecessor ("Princeton") of a counterclaim defendant ("LOS") in December 2005, and the claim was not filed by the counterclaim plaintiff ("Alcatel") until January 2011—such that if the patent's publication should have reasonably put Alcatel on notice of its claim, then that claim would be time-barred. *Id*. at *2, *9.  The Court ultimately agreed with the counterclaim defendants' argument that Alcatel should have, through the exercise of reasonable diligence, discovered the alleged trade secret by the date that the patent was published.  *Id*. at *9.

But crucially, the Court did so based on the presence of a number of factors that are not at play here.  For one thing, there were many facts of record indicating that Alcatel should have been particularly attuned to patent filings by Princeton at the time of the filing-at-issue:  (1) Princeton was Alcatel's competitor and it was located "down the street" from Alcatel; (2) prior to the filing date, Alcatel was so concerned by Princeton's conduct regarding possible misappropriation that it wrote a letter to Princeton requesting "assurances"; and (3) prior to the filing date, Princeton publicly announced that it had been awarded a $29 million contract by a customer whom Alcatel had been targeting.  *Id*. (internal quotation marks and citations omitted). Nothing anywhere near approaching these facts (in terms of Plaintiffs' connection with LG Chem at the relevant times of the filing of the four publications) is a part of the record in this case.  Moreover, while Alcatel had raised a fraudulent concealment-related tolling argument, it had done so in one conclusory sentence in its brief; the summary judgment record showed why that "bare-bones" argument was unavailing.  *Id*. at *9-10.  Here, in contrast, Plaintiffs' fraudulent concealment arguments are more well-developed, and we do not yet have a full summary judgment record on which to assess them.

For the above-stated reasons, the Court recommends that LG Chem's motion to dismiss be DENIED as to Count II.

### ii.    A&GC

A&GC makes two separate arguments as to why the claim against them in Count II should be dismissed on Rule 12(b)(6) grounds: (1) because the claim is time-barred, (D.I. 97 at 7-9); and (2) because Plaintiffs failed to plead sufficient facts to state a plausible claim, (*id*. at 9-15). The Court need only address the latter argument to conclude that the claim should be dismissed as to A&GC.

Pursuant to Delaware law, there are four elements to a claim for misappropriation of trade secrets: (i) a trade secret exists;[20] (ii) the trade secret was communicated to the defendant; (iii) the communication was made pursuant to an express or implied understanding that the secrecy of the information would be maintained; and (iv) the trade secret has been misappropriated within the meaning of that term as defined in DUTSA. *Alarm.com Holdings, Inc. v. ABS Cap. Partners Inc.*, C.A. No. 2017-0583-JTL, 2018 WL 3006118, at *6-7 (Del. Ch. June 15, 2018); *Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, C.A. No. 7866-VCP, 2014 WL 897223, at *13 (Del. Ch. Mar. 5, 2014)).[21]

---

[20]    Under the DUTSA, a "trade secret" is defined as "information, including a formula, pattern, compilation, program, device, method, technique or process, that: . . . [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use [and i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Del. Code Ann. tit. 6, § 2001(4). A&GC states in their briefing that they "do not concede that" the GeneExpress Product, including the Oncology Datasuite and Gene Logic Software, and data contained therein, in fact constitute trade secrets. (D.I. 97 at 10 n.10) But A&GC do not substantively contest this fact either in the briefing. And so for purposes of resolving A&GC's motion to dismiss, the Court accepts as true that (as stated in the SAC) these are in fact trade secrets. (SAC at ¶¶ 49-52)

[21]    The Court reviews these allegations under the typical *Twombly/Iqbal* pleading standard associated with Rule 8, as there are no allegations of misrepresentation or deception as

With regard to the fourth element (i.e., that a trade secret has been misappropriated), which is at issue here, the claimant must plead facts sufficient to plausibly demonstrate misappropriation by the defendant. *See Brightstar Corp. v. PCS Wireless, LLC*, C.A. No. N18C-10-250 PRW CCLD, 2019 WL 3714917, at *7 (Del. Super. Ct. Aug. 7, 2019). Section 2001(2) of DUTSA states that "misappropriation" shall mean:

a. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

b. Disclosure or use of a trade secret of another without express or implied consent by a person who:

1. Used improper means to acquire knowledge of the trade secret; or

2. At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade [secret] was:

A. Derived from or through a person who had utilized improper means to acquire it;

B. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

C. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use[.]

Del. Code Ann. tit. 6, § 2001(2); *see also Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 599 (Del. Ch. 2010). "Improper means" is defined in the DUTSA to "include theft, bribery, misrepresentation, *breach or inducement of a breach of a duty to maintain secrecy*, or espionage through electronic or other means." Del. Code Ann. tit. 6, 2001(1) (emphasis added).

---

to A&GC's conduct that might implicate Rule 9(b). *See Garcia v. Vertical Screen, Inc.*, CIVIL ACTION NO. 19-3184, 2020 WL 2615624, at *2 (E.D. Pa. May 22, 2020).

A&GC argues that Plaintiffs have failed to adequately plead misappropriation. So a good place to start in analyzing this issue is: How does the SAC allege that A&GC actually misappropriated Plaintiffs' trade secrets?

Here, an initial problem is that Count II itself makes it hard to figure this out. Most of the count involves conclusory statements that "Defendants" (that is LG Chem and A&GC, lumped together) have unlawfully used or disclosed the trade secrets at issue, without specifying who is alleged to have done what when.

But in looking back to the "Factual Background" section of the SAC, the pleading identifies A&GC as having some contact with the alleged trade secrets in a few different ways:

- In January 2019, the '206 application was published in A&GC's name, and the application made reference, *inter alia*, to the inventors' use of "microarray gene expression data obtained from the Gene Express Oncology Datasuite[] of Gene Logic Inc." in the process of formulating their invention.

- A&GC was assigned the '561 patent and the '660 patent; in the text of those patents, there are references to Plaintiffs' microarray data that, it is alleged, was used to develop the methods disclosed and claimed in those patents.

- A Gencurix product, GenesWell BCT, makes use of certain novel Endogenous Reference Genes ("ERGs") that were allegedly developed via use of Plaintiffs' trade secrets and are disclosed in the '206 application, the '561 patent and the '660 patent.

(SAC at ¶¶ 132-33, 147-68, 180) The SAC also states in paragraph 144 (hereafter, "paragraph 144") that "[d]uring a telephone conversation on June 2, 2020, Ocimum learned that usage of its proprietary oncology database by Abion and Gencurix was facilitated by LG Chem employee Dr. Koh." (*Id*. at ¶ 144)

Herein, the Court will assume *arguendo* that by publishing or obtaining or making use of the '206 application, the '561 patent and the '660 patent (documents that, in turn, describe how

the inventors relied on and made use of the alleged trade secrets), or, in Gencurix's case, by making use of certain ERGs (which, in turn, were developed via use of the alleged trade secrets) to formulate GenesWell BCT, then A&GC was "using"[22] the alleged trade secrets under the meaning of the law.[23] *Cf. Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 908-09 (3d Cir. 2021) (containing an expansive definition of "use" of trade secrets in this context). Nevertheless, for the reasons set out below, the Court concludes that the SAC does not sufficiently allege how A&GC used the alleged trade secrets while knowing, or having reason to know, that the they were derived from or through a party (e.g., LG Chem or others) who utilized "improper means" to acquire them, or that there was a duty to maintain the trade secrets' secrecy or limit their use (hereafter, that the trade secret was "obtained through improper means").

For example, Plaintiffs argue that A&GC should have known that material from the GeneExpress Product/database was obtained through improper means because: (1) A&GC should have known that LG Chem had an ongoing contractual duty to protect that material from

---

[22]      In their opening brief, A&GC asserted, without citation, that the "fact that the specification [of the above-mentioned three patent publications] references Plaintiffs' database is insufficient to allege use by A&GC." (D.I. 97 at 14)  But by the time of their reply brief, A&GC did not seem to still be hotly contesting that wrongful "use" was plausibly alleged; instead, there, they focused on other reasons why the claims should be dismissed.  (D.I. 117 at 1-3)

[23]      However, it is not clear to the Court that the SAC sufficiently alleges that A&GC "acquired" the Oncology Datasuite—in the sense of physically taking possession of the product.  In their briefing, A&GC deny that they ever did so (though in support they cite repeatedly to materials outside the pleadings, which the Court cannot consider here).  (*See* D.I. 97 at 11-12; D.I. 117 at 3)  The closest allegation in the SAC that might suggest this is in paragraph 144, and even there, the SAC only cryptically states that during a phone conversation, Plaintiffs "learned that usage of its proprietary oncology database by [A&GC] was facilitated" by Dr. Koh.  (SAC at ¶ 144)  The pleading never clearly states that this "usage" is said to have amounted to A&GC taking physical possession of the database.  Nor does the SAC otherwise describe how it is that such physical possession was accomplished.  Indeed, at times in their briefing, Plaintiffs hint that the SAC may not actually mean to allege that this type of "acquisition" of the trade secrets took place.  (D.I. 107 at 11-12)

disclosure; and (2) A&GC should have, but did not, conduct an inquiry to determine what right LG Chem (or any other downstream users of this data) had to use Plaintiffs' technology.  (D.I. 107 at 10)  The SAC certainly does make the bald assertion that A&GC "knew or should have known that the inventors of [the '206 application, the '561 patent and the '660 patent] did not have a license and were not otherwise authorized to use Ocimum's trade secrets" and that "[b]ased on the information available to them when they were 'assigned' Ocimum's trade secrets, Abion and Gencurix were in possession of information that should have put them on notice of trade secret misappropriation."  (SAC at ¶¶ 177, 183)  But in the SAC, Plaintiffs never plead facts explain *why* these bald assertions are correct.

Nor is that clear to the Court.  LG Chem is the entity that is alleged to have originally made wrongful use of the trade secrets.  Yet the SAC never really articulates why the nature of A&GC's connection to LG Chem should have tipped A&GC off about a duty of secrecy.  After all, A&GC were assigned the '206 application, the '561 patent and the '660 patent *in 2018 and thereafter—nearly two decades* after Gene Logic terminated the Access Agreement with LG Chem.  (SAC at ¶¶ 132, 156, 180)  And A&GC did not acquire this intellectual property directly from LG Chem.  (*Id*. at ¶ 180)  In fact, the only direct connection between A&GC and LG Chem is what is alleged in paragraph 144, where it is vaguely asserted that LG Chem employee Dr. Koh "facilitated" A&GC's use of Plaintiffs' database.  (*Id*. at ¶ 144)  But even there, no allegation is made as to when that "facilitat[ion]" occurred, or how A&GC knew or should have known, at the time of that facilitation, that information from the database had to be kept secret.

Plaintiffs also make mention of how the '206 application makes direct reference to the inventors' use of "Gene Express Oncology Datasuite[] of Gene Logic Inc."  (*Id*. at ¶¶ 133, 147-49)  And yet the SAC never explains *why* this reference alone should have caused A&GC to

learn that there had been a breach of a duty to maintain secrecy regarding that material. Nor do Plaintiffs cite to case law suggesting that in such circumstances, A&GC had a duty to investigate the original source of the material or to probe whether the material had been properly obtained/shared by that source or by others thereafter who came into contact with it. (D.I. 117 at 3-4)[24]

Now, the SAC does also allege that "[o]n December 5, 2019, Ocimum sent letters to Abion, Gencurix, and counsel prosecuting their patents, for an explanation of how they came into possession of the Oncology Datasuite." (SAC at ¶ 143; *see also* D.I. 107 at 11 (Plaintiffs asserting that "[t]his letter provided actual notice of Ocimum's claims"))[25] Plaintiffs have attached a copy of that letter (hereafter, the "December 5, 2019 letter") to their briefing. (D.I. 107, ex. 6)[26] And the Court agrees that, giving Plaintiffs the benefit of all reasonable inferences, the December 5, 2019 letter could plausibly have put A&GC on notice that any future unlicensed

---

[24] Plaintiffs also cite to federal caselaw for the proposition that A&GC could be liable for trade secret misappropriation if they were willfully blind to the reality that the trade secrets at issue were acquired through improper means or should be subject to secrecy/limited use. (D.I. 107 at 10-11 & n.2 (citing *Computer Assocs. v. Altai, Inc.*, 982 F.2d 693, 718-19 (2nd Cir. 1992); *Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*, 157 F.Supp.3d 407, 426 (D.N.J. 2016)). As a general matter, willful blindness has two components: (1) the defendant must subjectively believe that there is a high probability that a fact exists; and (2) the defendant must take deliberate action to avoid learning of this fact. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011).

For the same reasons as set out herein, there are simply not sufficiently plausible allegations that A&GC was willfully blind to circumstances indicating that that the trade secrets at issue were acquired through improper means, or that they should have remained subject to secrecy or limited use.

[25] Of note, the December 5, 2019 letter was sent on the very day that Plaintiffs filed this lawsuit. (D.I. 1)

[26] The Court can properly consider the letter's content here, since the letter is a document integral to the SAC.

use of information drawn from the Oncology Datasuite would be a breach of secrecy that was violative of the law.  (*Id.* (December 5, 2019 letter asserting that A&GC "may be in possession of an unauthorized copy of Ocimum's Oncology Datasuite" and that "Ocimum has searched its records and cannot find any license agreements granting your companies access to this proprietary database . . . [n]or are we aware of any current or former licensee that was given permission to provide this proprietary database to either of your companies"))

However, from there, the SAC does *not* sufficiently explain what *post-December 5, 2019 actions* either Abion or Gencurix took, after gaining this knowledge, that would amount to trade secret misappropriation.  While the SAC does describe how Gencurix has developed the GenesWell BCT product, (*id.* at ¶¶ 157-85), and alleges that Gencurix "commenced using GenesWell BCT in commerce in the United States in 2017," (*id.* at ¶ 169), the SAC makes no specific allegations as to what actions Gencurix took regarding that product (if any) after *December 5, 2019*, (*id.* at ¶¶ 157-85).  Instead, these portions of the SAC are largely ambiguous as to what Gencurix did when regarding this product.[27]

For the above stated reasons, the Court recommends that A&GC's motion to dismiss be GRANTED as to Count II.

### c.    Count III (Misappropriation of Trade Secrets Under the DUTSA)

In Count III, Plaintiffs assert trade secret misappropriation under the DTSA against all three Defendants.  Again, the Court will first address LG Chem's arguments for dismissal of this count, and then will take up A&GC's arguments.

---

[27]    In their briefing, Plaintiffs also suggest that A&GC may have taken post-December 5, 2019 acts that constitute misappropriation by "continu[ing] to prosecute and commercialize the offending patents."  (D.I. 107 at 11; *see also* SAC at ¶ 15)  But nowhere in the SAC do Plaintiffs plead any facts regarding any *particular* post-December 5, 2019 prosecution-related conduct *taken by A&GC* that can be said to amount to trade secret misappropriation.

### i.        LG Chem

Similar to the DUTSA, with regard to the DTSA:  (1) a claim must be brought within three years after the date on which the misappropriation is discovered, or by the exercise of reasonable diligence should have been discovered; and (2) a continuing violation constitutes a single claim of misappropriation.  18 U.S.C. § 1836(d).

LG Chem's first argument for dismissal of Count III is that the claim should be dismissed because it is time-barred.  Its argument here is identical to its argument for dismissal as to Count II; as there, the Court recommends that LG Chem's motion be DENIED on this ground.

But LG Chem has a second argument for dismissal of Count III:  that the DTSA does not apply to Plaintiffs' claim, because the claim pre-dates the statute's enactment.  (D.I. 102 at 10)  More specifically, LG Chem argues that: (1) a DTSA claim cannot be supported by a cause of action that arose prior to the statute's enactment on May 11, 2016, *see Cave Consulting Grp. v. Truven Health Analytics, Inc.*, Case No. 15-cv-02177-SI, 2017 WL 1436044, at *3 (N.D. Cal. Apr. 24, 2017) (noting that the DTSA only covers acts occurring "on or after the [May 11, 2016] date of the enactment of the Act") (internal quotation marks and citation omitted); *Avago Techs. U.S. Inc. v. nanoPrecision Prods., Inc.*, Case No. 16-cv-03737-JCS, 2017 WL 412524, at *8 (N.D. Cal. Jan. 31, 2017) (same); and (2) the claim against it in Count III is such a cause of action, in that "[a]ll of the articles at issue date before May 11, 2016, and each of the patent applications and patents at issue trace back before the DTSA enactment as well."  (D.I. 102 at 10)  In the Court's view, LG Chem is correct that Count III should be dismissed as to it.

In response to LG Chem's argument, Plaintiffs take two tacks, both of which are unsuccessful.  First, Plaintiffs cite to 10 paragraphs of the SAC, which each, in some form or another, assert vaguely that LG Chem's trade secret misappropriation may have continued to the

32

present day.  (D.I. 108 at 10 (citing SAC at ¶¶ 10, 31, 124-25, 129, 190-91, 193, 201, 205))  But here, the Court agrees with LG Chem that these paragraphs simply amount to "bare legal conclusions regarding post-2016 conduct" that include "no factual support."  (D.I. 116 at 3); *see also Morse*, 132 F.3d at 906 (noting that a court need not credit "a complaint's bald assertions or legal conclusions" when deciding a motion to dismiss) (internal quotation marks and citations omitted)).  In not one of these paragraphs do Plaintiffs provide any specific factual allegation of exactly what post-May 11, 2016 acts LG Chem is said to have taken to misuse Plaintiffs alleged trade secrets.  (SAC at ¶¶ 10, 31, 124-25, 129, 190-91, 193, 201, 205)  LG Chem is left to guess as to what it is being alleged to have done when, and that type of uncertainty is not countenanced by Rule 8 or federal pleading requirements.  Second, Plaintiffs again claim that LG Chem "'sold' Ocimum trade secrets to A&GC in June 2018."  (D.I. 108 at 10)  But as the Court previously noted, *see supra* p. 12, there is no factual support in the SAC for that premise.

For these reasons, the Court recommends that LG Chem's motion to dismiss be GRANTED as to Count III.

### ii.    A&GC

As to A&GC, with regard to Count III, the parties' arguments for or against dismissal of this DTSA claim were identical to those they made regarding Count II's DUTSA claim (in light of the similarity of the two statutes).  (D.I. 97 at 9-15; D.I. 107 at 10-17; D.I. 117 at 1-6)  For the same reasons as provided above with regard to Count II, the Court recommends that A&GC's motion to dismiss should be GRANTED as to Count III.[28]

---

[28]    The Court thus need not address A&GC's alternative argument that Count III should be dismissed as to them because the DTSA does not apply to Plaintiffs' claims.  (D.I. 97 at 15)

### B.    A&GC's Argument for Dismissal Pursuant to Rule 12(b)(2)

A&GC also alternatively argues for dismissal of Counts II and III due to lack of personal jurisdiction, pursuant to Rule 12(b)(2).  (D.I. 97 at 15)

Plaintiffs assert that personal jurisdiction exists as to A&GC pursuant to Federal Rule of Civil Procedure Rule 4(k)(2).[29]  (SAC at ¶ 9)  Rule 4(k)(2), which serves as a federal long-arm statute, allows a court to exert jurisdiction over a foreign defendant where the defendant lacks sufficient contacts in a single state to bring it within the reach of the state's long-arm statute, yet has enough contacts with the United States as a whole to make jurisdiction constitutional.  *Saudi v. Acomarit Maritimes Servs., S.A.*, 114 F. App'x 449, 455 (3d Cir. 2004).  Rule 4(k)(2) allows a court to exercise personal jurisdiction over a defendant if:  (1) the plaintiff's claim arises under federal law, (2) the defendant is beyond the jurisdictional reach of any state court of general jurisdiction; and (3) the defendant has sufficient contacts with the United States such that the court's exercise of personal jurisdiction comports with the due process requirements of the Constitution or other federal law.  *Saudi*, 114 F. App'x at 455.[30]

---

[29]    Rule 4(k)(2) reads as follows:  "For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws."  Fed. R. Civ. P. 4(k)(2).

[30]    When a defendant moves to dismiss a lawsuit for lack of personal jurisdiction, the plaintiff bears the burden of showing the basis for jurisdiction.  *Power Integrations, Inc. v. BCD Semiconductor Corp.*, 547 F. Supp. 2d 365, 369 (D. Del. 2008).  In a case like this one, where a district court has not held an evidentiary hearing, the plaintiff must only make a *prima facie* showing that personal jurisdiction exists.  *See Perlight Solar Co., Ltd. v. Perlight Sales N. Am. LL*, C.A. No. 14-331-LPS, 2015 WL 5544966, at *2 (D. Del. Sept. 18, 2015).  All factual inferences to be drawn from the pleadings, affidavits and exhibits must be drawn in the plaintiff's favor at this stage.  *Power Integrations*, 547 F. Supp. 2d at 369.

Here, with regard to the first factor of the Rule 4(k)(2) analysis, the only federal claim

pleaded against A&GC is in Count III, wherein Plaintiffs alleged a violation of the DTSA.  Yet

above, the Court has concluded that the SAC does not successfully plead a claim for a violation

of that statute.  Since the SAC does not contain a well-pleaded claim under federal law against

these Defendants, there is not personal jurisdiction over A&GC.  *See Rivet v. Regions Bank of

La.*, 522 U.S. 470, 475 (1998) (noting that "'[t]he presence or absence of federal-question

jurisdiction is governed by the well-pleaded complaint rule, which provides that federal

jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly

pleaded complaint.'") (citation omitted); *Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403,

1413 (Fed. Cir. 2009) (noting that claims arise under federal law for purposes of Rule 4(k)(2)

only when a "well-pleaded complaint establishes" that the claims invoke a federal legal right)

(internal quotation marks and citation omitted).

For this reason, the Court recommends that A&GC's motion to dismiss also be

GRANTED on the ground that there is no personal jurisdiction over them.[31]

## C.    A&GC's Motion to Strike

Lastly, A&GC moves to strike the above-referenced allegation in paragraph 144 of the

SAC, on the ground that it amounts to wrongful use of a communication made pursuant to

Federal Rule of Evidence 408.  (D.I. 97 at 19-20)  Above, the Court has explained why, even

---

[31]    Were Plaintiffs to have pleaded facts that clearly and understandably set out how
these Defendants committed a post-December 5, 2019 act of trade secret misappropriation, either
by "using" the trade secrets at issue in some way as to prosecution or assertion of the '206
application, the '561 patent and/or the '660 patent, or by doing so via Gencurix's development or
marketing of GenesWell BCT in the United States, then it might be that Rule 4(k)(2) jurisdiction
would exist.  *Cf. Touchcom, Inc.*, 574 F.3d at 1416; *Lismont v. Alexander Binzel Corp.*, Civil
Action No. 2:12cv592, 2013 WL 6095461, at *7 (E.D. Va. Nov. 18, 2013); *see also Oakwood
Labs. LLC*, 999 F.3d at 909.  But that type of analysis would need to proceed only when a
pleading actually sets out the existence of such relevant acts.

were it to consider that allegation, Counts II and III should still be dismissed.  In light of that, the Court orders that A&GC's motion to strike be DENIED as MOOT.

## III.    CONCLUSION

For the foregoing reasons, the Court recommends that the LG Chem motion to dismiss be GRANTED-IN-PART and DENIED-IN-PART, in that Counts I and II against LG Chem should survive dismissal, but Count III should be dismissed.  It recommends that the A&GC motion to dismiss be GRANTED as to both Counts II and III against them.[32]  And it orders that A&GC's motion to strike be DENIED as MOOT.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Because this Report and Recommendation may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Report and Recommendation.  Any such

---

[32]    To the extent that Plaintiffs seek leave to further amend the SAC as to claims recommended for dismissal against any Defendant, if the District Judge affirms the Court's recommendation of dismissal as to certain claims, then the District Judge will be best-positioned to determine whether to permit any further amended pleading.

redacted version shall be submitted no later than **August 3, 2022** for review by the Court.  It

should be accompanied by a motion for redaction that shows that the presumption of public

access to judicial records has been rebutted with respect to the proposed redacted material, by

including a factually-detailed explanation as to how that material is the "kind of information that

courts will protect and that disclosure will work a clearly defined and serious injury to the party

seeking closure." *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d

Cir. 2019) (internal quotation marks and citation omitted).  The Court will subsequently issue a

publicly-available version of its Report and Recommendation.


Dated:  July 31, 2022

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE