**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

OCIMUM BIOSOLUTIONS (INDIA) )
LIMITED and Don A. Beskrone, )
Trustee of OCIMUM BIOSOLUTIONS )
INC., )
)
               Plaintiffs, )    C.A. No. 19-2227 (JHS)
)
    v. )
)
LG CHEMICAL LTD., ABION, INC. )
and GENCURIX, INC., )
)
               Defendants. )

<u>**OPINION**</u>

**Slomsky, J.**                                              **September 30, 2024**

<u>**TABLE OF CONTENTS**</u>

**I.   INTRODUCTION** ................................................................................................ 4

**II.  BACKGROUND** ................................................................................................ 4

  **A.   Parties and Relevant Non-Parties** .................................................................. 4

  **B.   Factual Background** ......................................................................................... 5

    1.   Access Agreement .......................................................................................... 5

    2.   Alleged Acts of Misappropriation ................................................................. 7

      a.   Korean Patent Application Number KR 10-2006-0134883 ..................... 7

      b.   U.S. Patent Number 9,639,660 ............................................................... 7

      c.   U.S. Patent Application Number 12/521,498 ......................................... 8

1

    d.    The 2009 Article (the "2009 article") ........................................................ 8

    e.    U.S. Patent Number 11,220,716 ............................................................... 9

    f.    U.S. Patent Number 11,107,552 ............................................................... 9

    g.    GenesWell BCT ......................................................................................... 9

  3.    A&GC's Continued Prosecution and Acquisition of Patents Allegedly

        Misappropriating Plaintiffs' Trade Secrets ................................................ 10

  4.    Plaintiffs' Lack of Notice of Defendants' Misappropriation ...................... 11

  C.    Procedural Background ........................................................................................ 11

**III. STANDARD OF REVIEW** ................................................................................................ 12

  A.    Standard on a Motion to Dismiss Pursuant to Federal Rule of

      Civil Procedure (12)(b)(6) .................................................................................. 12

  B.    Standard on a Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to

      Federal Rule of Civil Procedure 12(b)(2) .......................................................... 14

  C.    Standard on a Motion to Strike Pursuant to Federal Rule of Civil Procedure 12(f) ......... 14

**IV. ANALYSIS** ........................................................................................................................ 15

  **A.    Defendants' Motions to Dismiss for Failure to State a Claim Under**

      **Rule 12(b)(6) Will Be Denied** .......................................................................... 15

    1.    Defendants' Motions to Dismiss Plaintiffs' Claims in Count I Will Be Denied ........ 16

      a.    LG Chem's Argument that Plaintiffs' Claim Fails Because It Pre-Dates the

          Enactment of the Defend Trade Secrets Act ("DTSA") .......................................... 16

b.    LG Chem's Argument that Plaintiffs' Claim Is Time Barred.................................. 18

c.    A&GC's Argument that Plaintiffs' Claim Is Time Barred Under the DTSA......... 24

d.    A&GC's Argument That Plaintiffs Cannot State a Claim for Misappropriation Under the DTSA ................................................................................................ 29

2.    Defendants' Motions to Dismiss Plaintiffs' Claims in Count II Will Be Denied ...... 32

a.    LG Chem and A&GC's Arguments that Plaintiffs' Claim is Time Barred Under the Delaware Uniform Trade Secrets Act ("DUTSA") ............................... 32

b.    A&GC's Argument that Plaintiffs Do Not Allege a Claim for Misappropriation Under the DUTSA ................................................................................................ 34

3.    LG Chem's Motion to Dismiss Plaintiffs' Claim in Count III Will Be Denied......... 35

**B.    A&GC's Motion to Dismiss for Lack of Personal Jurisdiction Will Be Denied** ....... 36

**C.    A&GC's Motion to Strike Will Be Denied** ..................................................................... 40

**V.   CONCLUSION** ................................................................................................................ 42

## I.      INTRODUCTION

This case arises out of allegations of trade secret misappropriation and breach of contract that first arose almost twenty years ago.  On January 11, 2024, Plaintiffs Ocimum Biosolutions (India) Limited and Don A. Beskrone, Chapter 7 Trustee of Ocimum Biosolutions Inc. ("Ocimum" or "Plaintiffs"), filed a Third Amended Complaint against Defendants LG Chemical Ltd. ("LG Chem"), Abion, Inc. ("Abion"), and Gencurix, Inc. ("Gencurix") (collectively "Defendants") alleging: (1) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), against all Defendants (Count I), (2) misappropriation of trade secrets under the Delaware Uniform Trade Secrets Act ("DUTSA"), against all Defendants (Count II), and (3) breach of contract against Defendant LG Chem (Count III).  (See Doc. No. 152.)  Before the Court is Defendant LG Chem's Motion to Dismiss Plaintiffs' Third Amended Complaint (Doc. No. 158) and Defendant Abion and Gencurix's ("A&GC") Motion to Dismiss Plaintiffs' Third Amended Complaint (Doc. No. 160).  For reasons that follow, the Motions will be denied.

## II.     BACKGROUND

### A.      Parties and Relevant Non-Parties

In his Report & Recommendation on Defendants' Motions to Dismiss Plaintiffs' Second Amended Complaint, United States Magistrate Judge Christopher J. Burke summarized the relevant parties and non-parties as follows[1]:

> Plaintiff Ocimum Biosolutions (India) Limited ("Ocimum") is an entity organized and existing under the laws of India with a place of business in Hyderabad, India. [(Doc. No. 152 at ¶ 1.)] Plaintiff Don A. Beskrone is the Chapter 7 trustee for the estate of Ocimum Biosolutions, Inc. ("Ocimum USA"), Ocimum's U.S. subsidiary, and a debtor under chapter 7 of title 11 of the United States Code. [(Id. at ¶ 2.)]

---

[1] Although the Report and Recommendation was not approved and adopted by this Court because leave was granted to Plaintiffs to file a Third Amended Complaint (Doc. No. 151), the description of the parties, factual events and certain matters are still relevant here.

4

> Non-party Gene Logic was a Delaware corporation; its genomics division was purchased by Ocimum and Ocimum USA on October 14, 2007. [(Id. at ¶¶ 46, 126.)] Gene Logic developed a genetic biological database called GeneExpress (the "GeneExpress Product"), which it licensed to drug companies for the purpose of streamlining testing in the pharmaceutical development process. [(Id. at ¶ 32.)] Defendants LG Chem, Abion and Gencurix are, respectively, each South Korean corporations with principal places of business in Seoul, Korea. [(Id. at ¶¶ 3-5.)] Neither Abion or Gencurix are current or former licensees of Ocimum or its predecessor, Gene Logic. [(Id. at ¶ 223.)]

(Doc. No. 119 at 2.)  Abion is a "biotech venture company at Seoul National University" that was established in 2007.  (Doc. No. 152 at ¶ 250.)  Gencurix was established on September 21, 2011.  (Id. at ¶ 256.)

### B. Factual Background

#### 1. Access Agreement

On or about October 15, 2000, Gene Logic and LG Chem entered into a licensing agreement (the "Access Agreement").  (Id. at ¶ 41.)  Through this Agreement, LG Chem obtained access to Gene Logic's Oncology Datasuite, a portion of Gene Logic's larger GeneExpress database, which are both alleged to be trade secrets.  (Id. at ¶ 41, 113-114.)  Section 5.2(c) of the Access Agreement prohibited LG Chem from providing information contained in the Oncology Datasuite to third parties without the "prior written consent of Gene Logic."  (Id. at ¶¶ 197-198.)  In Section 7.3, the Agreement specified that LG Chem was responsible for the acts of its employees, agents, consultants, and sublicensees.  (Id. at ¶¶ 214, 216.)  Section 7.5 of the Access Agreement further required LG Chem to provide notice to Ocimum "of every article and every patent application that it, or its current or former employees, were aware of that referenced results obtained by LG Chem, or authorized Third Parties, from using Ocimum's Oncology Datasuite."  (Id. at ¶ 109.)  Importantly, Sections 5.2(c), 7.3 and 7.5 are alleged to have survived termination of the Access Agreement.  (See id. at ¶¶ 197, 214, 107.)

Judge Burke summarized the relevant facts concerning the termination of the Access Agreement as follows:

> On or about December 6, 2002, Gene Logic sent a termination letter (the "termination letter") to LG Chem. [(Id. at ¶ 58.)] The termination letter was consistent with Gene Logic's corporate-wide termination procedures that it followed with customers who did not renew their license. [(Id. at ¶ 59.)] The termination letter stated in part: ["]Pursuant to Section 5.2 (a) of the [Access Agreement], access to the GeneExpress[] Product (Oncology DataSuite and the Gene Logic[] Software) is limited to the term of the agreement. Accordingly, pursuant to Section 7.1 (c), please ship the GeneExpress[] Product (all system and data disks containing Gene Logic's oncology data and all software programs, including any APIs) back to my attention by January 15th. Additionally, please destroy or erase all Gene Logic[] data on CD[s], hard disks, or tapes that were created or transferred to LG Biomedical Institute during the Term that contain the Oncology data and provide a letter to me certifying such destruction by January 15th.["] [(Id. at ¶ 58.)] The termination of the Access Agreement required LG Chem to stop using Gene Logic's proprietary data and it required LG Chem to transfer all the data it had been accessing back to Gene Logic, so that this data could no longer be accessed and used. [(Id. at ¶ 60.)] The Access Agreement in fact terminated on December 31, 2002. [(Id. at ¶ 57.)]
>
> On January 15, 2003, employees of LG Chem and Gene Logic had a meeting in Gaithersburg, Maryland; LG Chem employee Dr. Sang Seok Koh attended the meeting on behalf of LG Chem. [(Id. at ¶¶ 61-62.)] During this meeting, the companies discussed the "GeneExpress[] Database Wrap Up" and "LG Chem provided repeated assurances, through its statements and conduct, to Gene Logic that LG Chem had complied with its contractual termination obligations and had returned or destroyed all required information as requested in the December 6, 2002 termination letter." [(Id. at ¶¶ 61, 63.)] Plaintiffs allege, however, that despite these representations, "LG Chem secretly kept a copy of the Oncology Datasuite, which LG Chem continued to use long after the [Access] Agreement expired without paying the required access fee to Gene Logic." [(Id. at ¶¶ 66.)] Gene Logic was unaware that this occurred, and instead was led to believe that LG Chem had complied with its termination obligations. [(Id. at ¶¶ 81, 86.)]
>
> On October 14, 2007, Ocimum and Ocimum USA executed an Asset Purchase Agreement with Gene Logic, whereby Plaintiffs purchased Gene Logic's genomics division. [(Id. at ¶ 126.)] On December 17, 2007, Gene Logic and Ocimum USA executed an Assignment and Assumption Agreement, whereby Gene Logic assigned to Ocimum USA all rights, title, obligations, and interest in certain contracts to which Gene Logic was a party, including the Access Agreement. [(Id. at ¶ 130; Doc. No. 25, Ex. 8.)]

(Doc. No. 119 at 3-4.)

6

And, as discussed in more detail below, while not parties to the Access Agreement, Defendants Abion and Gencurix ("A&GC") are alleged to have obtained Plaintiffs' trade secrets from LG Chem.  (See Doc. No. 154 at ¶¶ 201, 235, 248.)  In their First Amended Complaint, Plaintiffs added A&GC as Defendants to the current action based on A&GC's acquisition of numerous patents alleged to misappropriate Plaintiffs' trade secrets, A&GC's continued prosecution of these patents and A&GC's development of products, including GenesWell BCT, that were allegedly developed using Plaintiffs' trade secrets.  (See id. at ¶¶ 192 208, 258, 263-69, 284, 298.)  A&GC are also named as Defendants in the Third Amended Complaint.  (See id.)

### 2.     Alleged Acts of Misappropriation

Plaintiffs allege Defendants misappropriated their trade secrets on several occasions by the following methods.

### a.     Korean Patent Application Number KR 10-2006-0134883

On or about December 27, 2006, Korean patent application KR 10-2006-0134883 (the "'883 Korean application") was filed.  (Doc. No. 152 at ¶ 168.)  Abion's Chief Execution Officer ("CEO"), Young Kee Shin, is named as an inventor on the '883 Korean application along with then LG Chem employee Dr. Sang Seok Koh.  (Id. at ¶¶ 163, 169, 196.)  The '883 Korean application is alleged to misappropriate Plaintiffs' trade secrets.  (Id. at ¶ 169.)

### b.     U.S. Patent Number 9,639,660

In September 2012, Seoul National University's "R&DB Foundation" (the "SNU R&DB Foundation") filed United States patent application number 13/631,279 (the "'279 application") which was later issued as United States patent number 9,639,660 (the "'660 patent").  (Id. at ¶ 192.)  The '279 application is based on Korean patent application PCT/KR2007/006890, which claimed priority to the '883 Korean application.  (Id. at ¶ 194.)  Included among the inventors

named on the '660 patent are Abion's CEO, Young Kee Shin, and LG Chem employee Dr. Sang Seok Koh.  (Id. at ¶ 200.)  The '279 application directly references the inventors' use of "microarray gene expression data obtained from the GeneExpress Oncology Datasuite<sup>TM</sup> of Gene Logic Inc." when developing the underlying invention.  (Id. at ¶ 192.)  LG Chem is alleged to have "provided a copy of Ocimum's trade secrets to every named inventor on the '660 patent."  (Id. at ¶ 201.)  In or about June 2018, all named inventors on the '660 patent assigned their interest in the '660 patent to A&GC.  (Id. at ¶ 208.)

### c.      U.S. Patent Application Number 12/521,498

On June 26, 2009, United States patent application number 12/521,498 (the "'498 application") was filed by A&GC and, soon after, assigned to the SNU R&DB Foundation.  (Id. at ¶ 254.)  The '498 application is the United States version of Korean patent application number KR2007006890W, filed December 27, 2007, which claims priority to the '883 Korean application.  (Id. at ¶ 251, 254.)

### d.      The 2009 Article (the "2009 article")

In 2009, several authors wrote an article titled "Identification of NovelReference Genes Using Multiplatform Expression Data and Their Validation for Quantitative Gene Expression Analysis" (the "2009 article").  (Id. at ¶ 139.)  Each of the authors listed on this 2009 article was also named as an inventor on the '660 patent, "including Abion's CEO, Young Kee Shin, and then LG Chem employee Sang Seok Koh."  (Id. at ¶ 200.)  The research collaboration resulting in the 2009 article "used [Plaintiffs'] Oncology Datasuite, which was provided by LG Chem without authorization."  (Id. at ¶ 145.)  Specifically, LG Chem is alleged to have used Plaintiffs' "Oncology Datasuite, or parts thereof, to create a database called 'the Cancer Genome Expression Database

of LG Life Science,'" and to have provided this database to researchers on the 2009 article.[2]  (Id. at ¶ 247-48.)

### e.    U.S. Patent Number 11,220,716

On March 28, 2018, U.S. patent application number 15/938,633 (the "'633 application") was filed by A&GC and later issued as U.S. patent number 11,220,716 (the "'716 patent").  (Id. at ¶ 304.)  Plaintiffs allege the '716 patent misappropriates their trade secrets in that it cites to the 2009 article and uses three reference genes that purportedly came from Plaintiffs' Oncology Datasuite.  (Id. at ¶ 304, 306.)

### f.    U.S. Patent Number 11,107,552

On January 10, 2019, U.S. patent application number 16/129,206 (the "'206 application") was published in the name of A&GC.  (Id. at ¶ 260.)  The '206 application later issued as U.S. patent number 11,107,552 (the "'552 patent").  (Id. at ¶ 261.)  The '206 application directly references its use of Plaintiffs' trade secrets.  (See id. at ¶ 263-69.)

### g.    GenesWell BCT

Plaintiffs allege that after A&GC obtained the rights to the research disclosed in the 2009 article, they are "now reaping the improper fruit of the 2009 research in the form of a cancer diagnostic product called GenesWell BCT" owned by A&GC.  (Id. at ¶ 152-53.)  Several of A&GC's patents, including the '660 and '552 patents, are alleged to cover GenesWell BCT.[3]  (Id. at ¶ 284.)  As discussed above, both the '660 and '552 patents are alleged to misappropriate Plaintiffs' trade secrets.  (See id. at ¶ 192, 263-69.)

---

[2] In or about 2017, LG Life Science merged with LG Chem.  (Doc. No. 152 at ¶ 141.)

[3] Plaintiffs also allege that A&GC's U.S. Patent 10,304,561 (the "'561 patent") covers GenesWell BCT. (Doc. No. 152 at ¶ 141.)  However, the TAC does not allege how the '561 patent is connected to Plaintiffs' trade secrets.  (See id. at ¶ 277.)

In addition, A&GC have obtained trademark protection from the United States government for GenesWell BCT and averred during prosecution of this trademark that A&GC started using GenesWell BCT in commerce in the United States in 2017.  (Id. at ¶ 285, 291-96.)  Further, A&GC are "marketing, selling, and/or promoting" GenesWell BCT throughout the world, including in the United States.  (Id. at ¶ 346.)  For example, in 2018, Gencurix is alleged to have attended the American Association of Cancer Research in San Diego, California to promote GenesWell BCT. (Id. at ¶ 347.)

### 3.   A&GC's Continued Prosecution and Acquisition of Patents Allegedly Misappropriating Plaintiffs' Trade Secrets

On December 5, 2019, Plaintiffs contacted A&GC by letter to inquire how A&GC had obtained a copy of Plaintiffs' trade secrets.  (Id. at ¶ 234.)  Plaintiffs allege that, "[d]uring a telephone conversation on June 2, 2020, [A&GC] told Ocimum that their usage of Ocimum's proprietary Oncology Database was facilitated by Sang Seok Koh, a former or current employee of LG Chem."  (Id. at ¶ 235.)  Despite notice that A&GC was improperly using Plaintiffs' trade secrets, A&GC have continued to prosecute and obtain patents that allegedly misappropriate Plaintiffs' trade secrets.  (See id. at ¶ 258, 298.)  As an example of A&GC's continued acquisition of these patents, Plaintiffs cite A&GC's '206 application, filed in January 2019, that is alleged to expressly reference its use of Plaintiffs' trade secrets.  (See id. at ¶ 260-69.)  Further, to illustrate A&GC's activity in continuing to prosecute these patents, Plaintiffs cite several instances in which A&GC prosecuted the '716 patent throughout 2020 and 2021.  (See id. at ¶ 298.) These activities include "IDS Transmitted," "Filed Response to Office Action," "Interview with Examiner," "Filed an Affidavit," and "Filed Response to Office Action."  (Id.)

### 4.    Plaintiffs' Lack of Notice of Defendants' Misappropriation

Plaintiffs allege that they were not put on notice of Defendants' Misappropriation until a period "within three years prior to filing this lawsuit."  (See id. at 226-33.)  To explain this lack of notice, Plaintiffs allege they had no reason to suspect that their confidential information had been misappropriated by LG Chem nor that LG Chem, which was one of Gene Logic's more than one hundred customers, "was misappropriating trade secrets . . . or breaching their prior agreement." (Id. at ¶ 227-28.)  Further, Plaintiffs claim that the '279 application, when filed, "was just one of about 2,671,800 patent applications filed worldwide in 2014. Plaintiffs had no reason to search for this patent application, versus the 2,671,799 other patent applications filed in 2014 to uncover Defendants' previously unknown misconduct."  (Id. at ¶ 226.)  Similarly, the "2009 [a]rticle was just one of nearly 2.5 million scientific papers that are sent out for publication each year. Plaintiffs had no reason to search for this article, versus the millions of others, to uncover Defendants' previously unknown misconduct."  (Id. at ¶ 188-89.)

### C.    Procedural Background

Judge Burke summarized the relevant procedural facts as follows:

On December 5, 2019, Ocimum filed the initial Complaint in this case; in that pleading, the Defendants included LG Chem, LG Life Sciences and two other entities (LG Corp. and LG Chem Life Sciences Innovation Center, Inc.). [(Doc. No. 2.) LG Corp. and LG Life Sciences were later dismissed voluntarily from the case. [(Doc. No. 14.)]

On March 11, 2021, United States District Judge Maryellen Noreika issued a Memorandum Opinion (the "March 11, 2021 MO") granting the then-current Defendants' motion to dismiss. [(Docs. No. 46, 47.)] On March 23, 2021, Plaintiffs filed a First Amended Complaint, which now named only the three current Defendants. [(Doc. No. 48.)] And on December 17, 2021, Plaintiffs filed the [Second Amended Complaint]. [(Doc. No. 90.)]

(Doc. No. 119 at 6.)  On July 31, 2022, United States Magistrate Judge Christopher J. Burke filed a Report and Recommendation regarding Defendants' Motions to Dismiss Plaintiffs' Second

Amended Complaint.  (Doc. No. 119.)  On December 21, 2023, the Court granted Plaintiffs'
request for leave to file a Third Amended Complaint ("TAC").  (Doc. No. 151.)  Because the Court
granted Plaintiffs' leave to file the TAC, the Report and Recommendation of Magistrate Judge
Burke became moot and was not approved and adopted.  (See id.)  On January 11, 2024, Plaintiffs
filed the operative TAC.  (Doc. No. 152.)  On February 23, 2024, Defendants filed respective
Motions to Dismiss Plaintiffs' TAC.  (Docs. No. 158, 160.)  Defendants' Motions to Dismiss
Plaintiffs' TAC are now ripe for disposition.

## III.   STANDARD OF REVIEW

### A.   Standard on a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure (12)(b)(6)

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure
to state a claim upon which relief can be granted is set forth in Ashcroft v. Iqbal, 556 U.S. 662
(2009).  After Iqbal, it is clear that "[t]hreadbare recitals of the elements of a cause of action,
supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to
dismiss.  Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  "To survive
dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to
relief that is plausible on its face.'"  Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir.
2018) (quoting Iqbal, 556 U.S. at 678).  Facial plausibility is "more than a sheer possibility that a
defendant has acted unlawfully."  Id. (quotation marks omitted) (quoting Iqbal, 556 U.S. at 678).
Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the
court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.
(quotation marks omitted) (quoting Iqbal, 556 U.S. at 678).  In assessing the plausibility of a claim,
the court must "accept all factual allegations as true, construe the complaint in the light most

favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).

Applying the principles of Iqbal and Twombly, the Third Circuit Court of Appeals in Santiago v. Warminster Township, 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (alteration in original) (quoting Iqbal, 556 U.S. at 675, 679). The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (second alteration in original) (citation omitted). The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

**B.      Standard on a Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Federal Rule of Civil Procedure 12(b)(2)**

Federal Rule of Civil Procedure 12(b)(2) provides that a motion to dismiss may be filed when the court does not have personal jurisdiction over a defendant.  "Once challenged, the plaintiff bears the burden of establishing personal jurisdiction."  O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 316 (3d Cir. 2007) (citation omitted).  To show personal jurisdiction, the plaintiff may rely on the allegations in the complaint, affidavits, or other evidence.  Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330 (3d Cir. 2009) (internal quotation and citation omitted).  However, to "survive a Rule 12(b)(2) motion to dismiss, a plaintiff may not merely rely on the allegations in its complaint."  Deardorff v. Cellular Sales of Knoxville, Inc., Civil Action No. 19-2642-KSM, 2020 WL 5017522, **1-2 (E.D. Pa. Aug. 25, 2020) (emphasis in the original) (citation omitted).  If the court "does not conduct [an] evidentiary hearing . . . [the] plaintiff need only plead [a] prima facie case" of jurisdiction to defeat a motion to dismiss.  Carteret Sav. Bank v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992) (citations omitted).  In deciding a motion to dismiss for lack of personal jurisdiction, the court "must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff."  Id.  (citations omitted).

**C.      Standard on a Motion to Strike Pursuant to Federal Rule of Civil Procedure 12(f)**

Pursuant to Federal Rule of Civil Procedure 12(f), upon a motion by either party, the "court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  The purpose of a Rule 12(f) motion to strike is to "clean up the pleadings, streamline litigation, and avoid the unnecessary forays into immaterial matters."  United States v. Educ. Mgmt. Corp., 871 F. Supp. 2d 433, 460 (W.D. Pa. 2012).  A matter is immaterial if it has

14

no essential or important relationship to the claim for relief.  Nelson v. Bender, No. 3:15-64, 2015

U.S. Dist. LEXIS 163619, at *11 (W.D. Pa. December 7, 2015).

Although courts possess considerable discretion in disposing of a motion to strike under

Rule 12(f), "striking a pleading is a 'drastic remedy' to be used sparingly because of the difficulty

of deciding a case without a factual record."  BJ Energy LLC v. PJM Interconnection, LLC, Nos.

08-3649 and 09-2864, 2010 U.S. Dist. LEXIS 36969 (E.D. Pa. April 13, 2010).

## IV.    ANALYSIS

In the TAC, Plaintiffs assert three claims against Defendants: (1) misappropriation of trade

secrets under the Defend Trade Secrets Act ("DTSA"), against all Defendants (Count I); (2)

misappropriation of trade secrets under the Delaware Uniform Trade Secrets Act ("DUTSA"),

against all Defendants (Count II); and (3) breach of contract against LG Chem (Count III).  (See

Doc. No. 152 ¶¶ 419-480.)  In their respective Memoranda in Support of their Motions to Dismiss

(Docs. No. 159, 161), Defendants offer a myriad of reasons why Counts I through III should be

dismissed.  The Court will address each of these arguments in turn.  First, the Court will address

the Defendants' Rule 12(b)(6) arguments. Next, the Court will address A&GC's argument

pursuant to Federal Rule of Civil Procedure 12(b)(2) that the claims against them should be

dismissed for lack of personal jurisdiction.  Finally, the Court will address A&GC's motion to

strike pursuant to Federal Rule of Civil Procedure 12(f).

### A.    Defendants' Motions to Dismiss for Failure to State a Claim under Rule 12(b)(6) Will Be Denied

The Court will address Defendants' Rule 12(b)(6) arguments as to Counts I, II, and III

separately.

#### 1. Defendants' Motions to Dismiss Plaintiffs' Claims in Count I Will Be Denied

In Count I, Plaintiffs assert a misappropriation of trade secrets claim under the DTSA against all Defendants.  (See Doc. No. 152 at ¶¶ 419-445.)  The DTSA requires that a plaintiff "demonstrate: (1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret, (2) that 'is related to a product or service used in, or intended for use in, interstate or foreign commerce[,]' and (3) the misappropriation of that trade secret . . . ."  Oakwood Lab'ys LLC v. Thanoo, 999 F.3d 892, 905 (3d Cir. 2021) (quoting 18 U.S.C. § 1839(3), (5)) (internal citations omitted).  In support of its Motion to Dismiss, Defendant LG Chem argues Count I should be dismissed for two reasons: (1) Plaintiffs' claim fails because their allegations under the DTSA pre-date the enactment of the DTSA, and (2) Plaintiffs' claim is time barred by the DTSA's three-year statute of limitations. (Doc. No. 159 at 17.)  Similarly, A&GC argue that Count I should be dismissed for two reasons: (1) Plaintiffs' claim is time barred, and (2) Plaintiffs fail to sufficiently allege misappropriation by A&GC.  (Doc. No. 161 at 12-26.)  The Court will address each of LG Chem and A&GC's arguments separately.

##### a. LG Chem's Argument that Plaintiffs' Claim Fails Because It Pre-Dates the Enactment of the Defend Trade Secrets Act ("DTSA")

LG Chem argues Plaintiffs' DTSA claims must be dismissed because each "of the patent applications and publications that provide the basis for Plaintiff's misappropriation claims trace back [to] before May 11, 2016," the DTSA's date of enactment.  The DTSA has been recognized to "only cover[] acts [of misappropriation] occurring 'on or after the [May 11, 2016] date of the enactment of the Act.'"  Cave Consulting Grp. v. Truven Health Analytics, Inc., No. 15-cv-02177-SI, 2017 WL 1436044, at *3 (N.D. Cal. Apr. 24, 2017) (internal citation omitted).  The DTSA

provides three ways to establish a misappropriation occurred: (1) by proving acquisition through improper means, (2) by proving disclosure without consent, or (3) by proving use of a trade secret without consent. 18 U.S.C. § 1839(5); see also Oakwood, 999 F.3d at 907-08. The Third Circuit Court of Appeals has defined "use" of a trade secret broadly, encompassing "all the ways one can take advantage of trade secret information to obtain an economic benefit, competitive advantage, or other commercial value, or to accomplish a similar exploitative purpose, such as 'assist[ing] or accelerat[ing] research or development.'" Oakwood, 999 F.3d at 910.

In response to LG Chem's argument, Plaintiffs point to two alleged acts of misappropriation by LG Chem occurring after May 11, 2016. (See Doc. No. 169 at 22.) First, Plaintiffs cite to the 2017 issuance of the '660 patent. (Id.) The '660 patent issued in response to the '279 application, initially filed in September 2012, that directly references "the GeneExpress Oncology Datasuite™ of GeneLogic Inc." when discussing the research process for the application's underlying invention. (Doc. No. 152 at ¶ 194.) Second, Plaintiffs claim the 2018 assignment of rights under the '660 patent from an LG Chem employee, Dr. Sang Seok Koh, to A&GC is another act of misappropriation by LG Chem under the DTSA. (Doc. No. 169 at 22.) In making this second argument, Plaintiffs assert that LG Chem is responsible for the acts of its employees under Sections 5.2(c), 7.3 and 7.5 of the Access Agreement. (Id.) Because Dr. Koh was an employee of LG Chem, Plaintiffs argue that Dr. Koh's act of assigning his rights under the '660 patent to A&GC is an act of misappropriation attributable to LG Chem. (Id.)

Assuming the veracity of Plaintiffs' allegations and construing all reasonable inferences that may be drawn from these allegations in favor of Plaintiffs, the Court is satisfied that the 2017 issuance of the '660 patent and the 2018 assignment of rights under the '660 patent could qualify as "use" of a trade secret under the Third Circuit's broad definition. See 18 U.S.C. § 1839(5);

Oakwood, 999 F.3d at 910 (holding "use" of a trade secret, as used in the DTSA's meaning of misappropriation, should be construed broadly.)  Certainly, a direct reference to Plaintiffs' trade secrets on an application for a United States patent, and the corresponding issuance of said patent, qualifies as a way "one can take advantage of trade secret information."  (See Doc. No. 152 at ¶ 194); Oakwood, 999 F.3d at 910.  Similarly, the assignment of rights under the aforementioned patent is another way "one can take advantage of trade secret information."  (See Doc. No. 169 at 22); Oakwood, 999 F.3d at 910.  Accordingly, Plaintiffs have sufficiently alleged that LG Chem engaged in acts of misappropriation after May 11, 2016 for the purpose of Plaintiffs' DTSA claim.[4]

### b.  LG Chem's Argument that Plaintiffs' Claim Is Time Barred

LG Chem next argues that Plaintiffs' DTSA claim should be dismissed because it "accrued more than three years before the filing of this lawsuit." (Doc. No. 159 at 17-18.)  Under the DTSA, a claim must be brought within three years after the date on which the misappropriation is discovered or, by the exercise of reasonable diligence, should have been discovered.  18 U.S.C. § 1836(d). As mentioned above, the DTSA provides three ways to establish a misappropriation occurred: (1) by proving acquisition through improper means, (2) by proving disclosure without

---

[4] In support of their argument that alleged misappropriation occurred after the DTSA's enactment, Plaintiffs allege that LG Chem still has a copy of Plaintiffs' trade secrets today.  (Doc. No. 169 at 22.)  Accepting this allegation as true, the Court is not convinced that LG Chem's acquisition of Plaintiffs' trade secrets without consent in 2003 is enough to qualify as an act of misappropriation post-May 2016.  Plaintiffs correctly point out that it would be improper at this stage in the proceedings for the Court to draw the inference against Plaintiffs that LG Chem disposed of Plaintiffs' trade secrets "at some unknown date after 2009." (Id.)  However, mere allegations that LG Chem still possesses Plaintiffs' trade secrets, without more, is not enough to allow the Court to draw the inference that LG Chem acquired Plaintiffs' trade secrets through improper means, disclosed Plaintiffs' trade secrets without consent, or used Plaintiffs' trade secrets without consent at any time after the DTSA's enactment on May 11, 2016.  See 18 U.S.C. § 1839(5); see also Cave Consulting Grp., 2017 WL 1436044, at *3 (recognizing the DTSA "only covers acts [of misappropriation] occurring 'on or after the [May 11, 2016] date of the enactment of the Act'").

consent, or (3) by proving use of a trade secret without consent.  18 U.S.C. § 1839(5); see also Oakwood, 999 F.3d at 907-08.  And, once again, the Third Circuit has defined "use" of a trade secret broadly, encompassing "all the ways one can take advantage of trade secret information to obtain an economic benefit, competitive advantage, or other commercial value, or to accomplish a similar exploitative purpose, such as 'assist[ing] or accelerat[ing] research or development.'" Oakwood, 999 F.3d at 910.  For the purpose of the DTSA's limitation period, "a continuing misappropriation constitutes a single claim of misappropriation."  Id.

Here, Plaintiffs initially filed suit against LG Chem on December 5, 2019.  (Doc. No. 159 at 12.)  Accordingly, to overcome LG Chem's argument that their DTSA claim is time barred, Plaintiffs must plead they did not discover LG Chem's misappropriation until some point after December 5, 2016.  (Id.)  To support its argument that Plaintiffs' DTSA claim is time barred, LG Chem asserts that "far more than three years passed between the alleged misappropriation and the filing of this suit" and that "any diligence would have revealed the alleged misappropriation earlier and started the statute of limitations clock years, if not a decade or more, before this lawsuit." (Doc. No. 159 at 18.)  In their response, Plaintiffs rely on the tolling doctrine of fraudulent concealment, arguing they did not discover LG Chem's misappropriation until a time within three years of filing suit because LG Chem concealed its misappropriation from Plaintiffs.[5]  (See Doc. No. 169 at 11-13.)

---

[5] In their TAC, Plaintiffs also request tolling based on the doctrine of inherent unknowability. (Doc. No. 152 at 111.)  But Plaintiffs focus the substance of their tolling argument primarily on the doctrine of fraudulent concealment.  (See Doc. No. 169 at 11-21.)  Because the Court finds Plaintiffs plausibly allege fraudulent concealment, the Court need not address any arguments on the doctrine of inherent unknowability.

Delaware law recognizes three tolling doctrines which operate to pause the statute of limitations' clock until a plaintiff discovers "facts constituting the basis of the cause of action <u>or</u> the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts."[6] <u>Coleman v. PricewaterhouseCoopers, LLC</u>, 854 A.2d 838, 842 (Del. 2004) (internal quotation marks omitted) (emphasis in original).  In his Report and Recommendation, Judge Burke summarized the tolling doctrine of fraudulent concealment as follows:

> "Under Delaware law, fraudulent concealment tolls a statute of limitations where a defendant has done some affirmative act or acts involving 'actual artifice' which prevents a plaintiff from discovering the facts giving rise to his or her cause of action, 'or [where a defendant has made] some misrepresentation which is intended to put the plaintiff off the trail of inquiry.'" <u>Capricorn Pharma, Inc. v. Matrixx Initiatives, Inc.</u>, Civil Action No. 08-873-JJF, 2009 WL 2567022, at *4 (D. Del. Aug. 19, 2009) (quoting <u>Halpern v. Barran</u>, 313 A.2d 139, 143 (Del. Ch. 1973)). Therefore, to assert fraudulent concealment, Plaintiffs must allege that the LG Chem "had actual knowledge of the wrong done and acted affirmatively in concealing the facts" from the plaintiff. <u>Ewing v. Beck</u>, 520 A.2d 653, 667 (Del. 1987).

(Doc. No. 119 at 14-15.)

Here, Plaintiffs' TAC makes numerous allegations that LG Chem had actual knowledge of the misappropriation and performed affirmative acts to conceal this misappropriation from Plaintiffs.  (<u>See</u> Doc. No. 152 at ¶¶ 58-86.)  Among these allegations are the following:

- At the January 15th Meeting [concerning the "GeneExpress® Database Wrap Up"], and at all times contemporaneous to that meeting, LG Chem provided repeated assurances, through its statements and conduct, to Gene Logic that LG Chem had complied with its contractual termination obligations and had returned or destroyed all required information as requested in the December 6, 2002 termination letter. Unknown to Gene Logic, however, this was not true, and LG Chem knew it.

---

[6] "[S]tate tolling principles are generally to be used by a federal court when it is applying a state limitations period." <u>Bohus v. Beloff</u>, 950 F.2d 919, 924 (3d Cir. 1991).

- LG Chem furthered its active concealment by returning hard disks containing the Oncology Datasuite to Gene Logic, as requested by Gene Logic, which was an act solely intended to mislead Gene Logic, and make Gene Logic believe it had received everything in LG Chem's possession.

- By returning these hard disks to Gene Logic, LG Chem had furthered its fraud, inducing Gene Logic to believe that LG Chem was actively complying with its contractual termination obligations, and giving up its use, and sources for the Oncology Datasuite, when it was not.

- As part of exercising diligence in protecting its trade secrets, Gene Logic's customer service department in fact erased the disks it received from LG Chem and returned those empty disks back to LG Chem.

- As evidence that it had, in fact, been deceived by LG Chem, and had relied on the actions and representations of LG Chem, contemporaneous notes on the "LG Chem Wrap-up" indicate that, consistent with LG Chem's representations during the January 15th Meeting and related actions, Gene Logic erroneously believed that the license termination process with LG Chem was "COMPLETED" by January 22, 2003.

- LG Chem's course of conduct before, during and after the January 15, 2003 meeting, including discussing and confirming compliance with its termination obligations, returning its copy of the installation disks, and returning the E450 server, while simultaneously hiding the fact that it improperly retained a copy of the Oncology Datasuite, led Gene Logic to reasonably believe that LG Chem had honored and complied with its contractual obligations.

(Id.)  The Court agrees with Plaintiffs that these facts plausibly establish the applicability of the fraudulent concealment tolling doctrine.  As Judge Burke recognized when considering these facts:

> [These facts] amount to specifically-alleged, affirmative acts by LG Chem—acts that falsely assured Plaintiffs that LG Chem no longer had any versions of the Oncology Datasuite (and thus could no longer use that product).  This, in turn, is said to have lulled Plaintiffs into a false sense of security—i.e., Plaintiffs were not aware of or on the lookout for contractual breaches by LG Chem in the future, because they believed (wrongfully, thanks to LG Chem's actions and misrepresentations) that no such breaches could possibly occur. . . . If LG Chem made affirmative misrepresentations in 2003 that effectively fooled Plaintiffs into thinking that LG Chem had complied with the Access Agreement and would no longer have the ability to utilize the Oncology Datasuite, then it stands to reason that the effect of those representations could—unless other events intervened—last quite a long time. Put differently, once Plaintiffs were misled by the alleged fraud, it seems plausible that they might well have remained misled for years.

(Doc. No. 119 at 17-18.)

Despite the plausibly alleged affirmative acts of concealment, LG Chem argues that Plaintiffs were on inquiry notice of LG Chem's alleged misappropriation long before Plaintiffs purport to have discovered the misappropriation "within three years of filing" suit.  (Doc. No. 159 at 18.)  Tolling under the doctrine of fraudulent conveyance ceases when a plaintiff, "exercising reasonable diligence, should have discovered the alleged injury," including discovery through inquiry notice.  Gen. Video Corp. v. Kertesz, No. 1922-VCL, 2008 WL 509816, at *5 (Del. Ch. Feb. 25, 2008) (internal quotation marks and citation omitted).  As Judge Burke noted:

> "Inquiry notice does not require a plaintiff to have actual knowledge of a wrong, but simply an objective awareness of the facts giving rise to the wrong." Lion 2004 Receivables Tr. v. Long Term Preferred Care, Inc., C.A. No. 16-723-RGA-MPT, 2017 WL 1053100, at *6 (D. Del. Mar. 20, 2017) (internal quotation marks and citations omitted), report and recommendation adopted, 2017 WL 3783258 (D. Del. Aug. 31, 2017). Accordingly, "[i]n examining whether the plaintiff was on inquiry notice, the court determines whether there were any red flags that clearly and unmistakably would have led a prudent person of ordinary intelligence to inquire and if pursued, would have led to discovery of the elements of the claim being asserted." Id. (internal quotation marks, brackets and citations omitted); see also Machala v. Boehringer Ingelheim Pharms., Inc., C.A. No.: N16C-12-231-PRA, 2017 WL 2814728, at *6 (Del. Super. Ct. June 29, 2017). The "critical inquiry" is thus whether Plaintiffs were entitled to rely on LG Chem's representations for as long as they did. Lion 2004 Receivables Tr., 2017 WL 1053100, at *6 (internal quotation marks and citation omitted).

(Doc. No. 119 at 19.)  LG Chem asserts that because "[e]ach article and patent publication described in the TAC identifies Gene Logic by name and the GeneExpress Oncology DataSuite™ product by trademark as the source of the data . . . Plaintiffs should have discovered the articles and patent publications that Plaintiffs admit put them on notice of LG Chem's [alleged] misappropriation."  (Doc. No. 159 at 19.)

In response, Plaintiffs cite to a number of paragraphs in the TAC that purport to explain why Plaintiffs never uncovered any of the articles or patent publications that mention Gene Logic or its product by name.  (Doc. No. 169 at 13.)  These explanations include the following:

- When the 2009 Article was written, LG Chem was merely a former licensee of Plaintiffs' predecessor whose access to GeneExpress ended before GeneExpress was acquired by Plaintiffs.

- Plaintiffs had no reason to search specifically for the 2009 Article.

- The 2009 Article was just one of the nearly 2.5 million scientific papers that are sent for publication each year.

- Plaintiffs had no reason to search for this article, versus the millions of others, to uncover Defendants' previously unknown misconduct.

- When filed, the 279 application was just one of about 2,671,800 patent applications filed worldwide in 2014. Plaintiffs had no reason to search for this patent application, versus the 2,671,799 other patent applications filed in 2014 to uncover Defendants' previously unknown misconduct.

- Before becoming aware of the '279 application within three years prior to filing this lawsuit, neither Ocimum nor its predecessor, Gene Logic, had any reason to believe or suspect that LG Chem, out of its more than a hundred customers, was misappropriating trade secrets embodied in GeneExpress or breaching their prior agreement.

- Before becoming aware of the '279 application within three years prior to filing this lawsuit, there were no interactions between Plaintiffs and Defendants that would have put Plaintiffs on notice of any claims against Defendants.

- When the '279 application was filed, LG Chem was merely a former licensee of Plaintiffs' predecessor whose access to GeneExpress ended over a decade earlier.  Plaintiffs had no reason to search for this article or this patent application.

(Doc. No. 152 at ¶¶ 185-90; 226-33.)  The Court again agrees with Plaintiffs that, at this stage of the proceedings, accepting the allegations in the TAC as true, these facts plausibly explain why Plaintiffs failed to discover the articles and patent publications.  As Judge Burke recognized when considering these facts:

23

[These allegations] help to demonstrate why LG Chem—just one of a large number of former customers of Gene Logic/Plaintiffs, and one who did not reinsert itself into Gene Logic's or Plaintiffs' business dealings in the interval—would not necessarily have been on Plaintiffs' radar screen during these intervening years. And they provide additional context as to why, during this time period, Plaintiffs might not have been scouring the Internet for articles or patent applications (assuming those publications were in fact available via the Internet) in some way related to LG Chem.

(Doc. No. 119 at 20-21.)

Accordingly, because the Court finds Plaintiffs have sufficiently alleged that LG Chem engaged in acts of misappropriation after the DTSA's enactment and have also sufficiently demonstrated the applicability of the tolling doctrine of fraudulent concealment, the Court will deny LG Chem's Motion to Dismiss Plaintiffs' Third Amended Complaint (Doc. No. 158) as to Count I.

### c.   A&GC's Argument that Plaintiffs' Claim Is Time Barred Under the DTSA

Like LG Chem, A&GC also argue that Plaintiffs' DTSA claim fails because it is statutorily time barred.  (Doc. No. 161 at 12.)  As discussed above, under the DTSA, a claim must be brought within three years after the date on which the misappropriation is discovered or, by the exercise of reasonable diligence, should have been discovered.  18 U.S.C. § 1836(d).  And as noted earlier, the DTSA provides three ways to establish a misappropriation occurred: (1) by proving acquisition through improper means, (2) by proving disclosure without consent, or (3) by proving use of a trade secret without consent.  18 U.S.C. § 1839(5); see also Oakwood, 999 F.3d at 907-08.

"Under Delaware law, the statute of limitations begins to run when a plaintiff has (1) actual notice of the basis for the cause of action or (2) has inquiry notice—i.e., notice of facts from which the basis for the cause of action could have been discovered by the exercise of reasonable diligence." RoboticVISIONTech, Inc. v. ABB Inc., No. 22-1257-GBW, 2024 WL 1299691, at *2

(D. Del. Mar. 27, 2024) (applying Delaware law regarding statutes of limitation to the DTSA's statute of limitation).   For the purpose of the DTSA's limitation period, "a continuing misappropriation constitutes a single claim of misappropriation."   18 U.S.C. § 1836(d).   "The raising of the defense of the statute of limitations, * * * is a personal privilege of the defendant." Zelson v. Thomforde, 412 F.2d 56, 59 (3d Cir. 1969) (ellipsis in original).

A&GC first argue that any alleged misappropriation Plaintiffs attribute to A&GC are merely continuing misappropriations that, under the DTSA, constitute a single claim which first accrued prior to the December 27, 2006 filing of the '883 Korean application.  (See Doc. No. 161 at 8-10, 14.)  In response, Plaintiffs assert that the act of misappropriation that occurred prior to December 27, 2006 is only attributable to LG Chem, and that A&GC cannot rely on LG Chem's acts of misappropriation because the "continuing misappropriation" doctrine is applied by courts to defendants individually.  (See Doc. No. 171 at 11-12.)  Instead, Plaintiffs argue that A&GC's actions of "acquiring [Plaintiffs'] trade secrets, prosecuting patents that embody those trade secrets, and commercializing those trade secrets in the United States" are acts of misappropriation attributable entirely to A&GC.  (Id. at 11.)

While the TAC alleges that A&GC initially acquired Plaintiffs' trade secrets at some point during research on the 2009 article, which is well before the statute of limitations period, it also alleges that A&GC have prosecuted patents embodying Plaintiffs' trade secrets and commercialized those trade secrets in the United States at times within the statute of limitations period.  (See Doc. No. 152 at ¶¶ 161-170, 291-298.)  Specifically, the TAC alleges that A&GC have taken action to prosecute patents that embody Plaintiffs' trade secrets throughout 2020 and 2021 and, further, that A&GC have continuously engaged in commercialization of its GenesWell BCT product, a product that Plaintiffs allege embody their trade secrets, since 2017.  (See id. at ¶¶

25

291-298.)  Because these alleged acts of misappropriation fit within the Third Circuit's broad definition of "use" of a trade secret, Plaintiffs have sufficiently alleged acts of misappropriation attributable to A&GC within the statute of limitations period.

A&GC next argue that "Plaintiffs had, or should have had, notice of their alleged trade secret claim more than three years prior to the [March 3, 2021] filing of the Amended Complaint against A&GC."  (Doc. No. 161 at 13, 15.)  To support this assertion, A&GC point to five "public disclosures" they claim were each "sufficient to either put Plaintiffs on notice, or should have put Plaintiffs on notice, of the existence of their claims, well prior to the statute of limitations period (e.g. prior to March 3, 2018.)"  (Id. at 13.)  First, A&GC cites the filing of the '883 Korean patent application in 2006, which directly references the inventors' use of Plaintiffs' trade secrets when conducting research on the underlying invention.  (See id. at 10, 13.)  Next, A&GC point to Korean patent application number PCT/KR2007/006890, a "2007 PCT Application published in English on July 3, 2008 . . . [that] clearly recites 'GeneExpress Oncology Datasuite$^{TM}$ of Gene Logic Inc.'" (Id. at 14.)  Third, A&GC refer to the 2009 article, published in English, which the TAC claims involved a research collaboration that used Plaintiffs' trade secrets without their authorization. (Id.; Doc. No. 152 at ¶¶144-145.)  Fourth, A&GC cite to the '498 application, filed June 28, 2009, "and, the resultant publication of US 2010/0137149 on June 3, 2010."  (Doc. No. 161 at 14-15.)  Finally, A&GC point to the 2014 publication of U.S. patent application number 2014/0038833 (the "'833 application") because "around the time of the publication of the '833 Application, Plaintiffs were bringing trade secret claims against other parties arising out of alleged use of the Oncology Datasuite."  (Doc. No. 184 at 5, 7.)

In response, Plaintiffs assert that A&GC have failed to cite to a publication outside of the statute of limitations period that would have alerted Plaintiffs to their claims against A&GC.  (Doc.

No. 171 at 11.)  In making this argument, Plaintiffs contend that none of the four documents cited

by A&GC mention A&GC by name.  (Id. at 13.)  But the Court does not entirely agree with this

contention.[7]  However, the Court previously considered two of these four publications in its statute

of limitations analysis for LG Chem.[8]  There, the Court concluded Plaintiffs had sufficiently pled

facts explaining how they were not put on notice of LG Chem's purported misappropriation from

---

[7] In the TAC, Plaintiffs attempt to connect the '883 Korean application, the 2007 PCT Application, and the 2009 article directly to Abion.  (See Doc. No. 152 at ¶¶ 161-166.)  Specifically, Plaintiffs allege as follows:

- On July 7, 2021, Abion filed a signed declaration in this Court from its Vice President and Chief Operating Officer, Jun Young Choi, averring that "Abion was not involved in the research or development of the invention disclosed in KR 10-2006-0134883 and PCT/KR2007/006890 and did not have any role in the preparation or prosecution of these patents." . . .
- This signed declaration is demonstrably false . . .
- As is clearly shown on the face of KR 10-2006-0134883 and PCT/KR2007/006890, Abion's CEO, Young Kee Shin, is a named inventor on these filings, which led to issuance of the '660 patent in the United States.
- In its filings, Abion admits that technology disclosed in KR 10-2006- 0134883 and PCT/KR2007/006890 was "developed by our CEO while serving concurrently as a professor at Seoul National University" and "was transferred to Abion Co., Ltd. for commercialization." (emphasis added).
- Abion's statements to the contrary in this Court are demonstrably false.
- Further, in its March 31, 2017 Prospectus, Abion takes credit for the work underlying the 2009 Article and the patent that was ultimately issued, stating "we have patented our own standard gene group (Registration number: 1010079260000) and also published a paper on it (Mi Jeong Kwon et al., PLOS one, 2009)." (emphasis added).

(Id.)  But Plaintiffs allege, in the one instance, Abion's direct involvement in the '883 Korean application, 2007 PCT Application and 2009 article and, in the next instance, argue that A&GC has failed to cite to a publication outside of the statute of limitations period that would have alerted Plaintiffs to their claims against A&GC.  (See id.)

[8] While the Court considered these publications in its analysis to determine whether Plaintiffs had inquiry notice to defeat the applicability of the tolling doctrine of fraudulent concealment.  The same reasoning applies when considering whether Plaintiffs were on inquiry notice for the purpose of starting the statute of limitation's clock.

the 2009 article and '279 application.[9]  Certainly, if Plaintiffs plausibly alleged that the 2009 article and '279 application did not put Plaintiffs on inquiry notice of LG Chem's alleged misappropriation, these allegations also sufficiently explain why Plaintiffs were not put on inquiry notice of A&GC's alleged misappropriation by these same publications.

The Court believes this rationale also applies to the '833 application.  While the Court cannot find reference in the TAC to the '833 application, the TAC does explain why Plaintiffs were not put on notice from the 2014 publication of another patent application, the '279 application.  (See Doc. No. 152 at ¶ 226.)  There, Plaintiffs plead that "[w]hen filed, the [']279 application was just one of about 2,671,800 patent applications filed worldwide in 2014. Plaintiffs had no reason to search for this patent application, versus the 2,671,799 other patent applications filed in 2014 to uncover Defendants' previously unknown misconduct." (Id.)  The Court concludes these facts also sufficiently explain why Plaintiffs were not put on notice of the '833 patent application's publication in 2014.

Further, the Court is not convinced the '883 Korean application and 2007 PCT Application were enough to put Plaintiffs on inquiry notice of A&GC's purported misappropriation.  As Plaintiffs note, patent applications are just one of many factors a court should consider when determining whether a party has notice of their claims to start the statute of limitations' clock.  (See Doc. No. 171 at 13); Illumina, Inc. v. Guardant Health, Inc., No. 22-334-GBW-CJB, 2023 WL 1407716, at *11 (D. Del. Jan. 31, 2023) ("[T]here is not a per se rule that if a patent application or patent issues and it contains misappropriated trade secrets, then this starts the statute of limitations clock ticking in every case.")  And these particular patent applications are Korean, rather than United States, applications.  While A&GC allege the 2007 PCT Application was published in

---

[9] See the Court's discussion in Section IV(A)(1)(b).

English in 2008, the Court cannot conclude two Korean patent applications should have put Plaintiffs on inquiry notice of their claims against A&GC.  (See Doc. No. 161 at 14.)  Accordingly, Plaintiffs have sufficiently alleged acts of misappropriation attributable to A&GC within the DTSA's statute of limitations period.

### d.     A&GC's Argument That Plaintiffs Cannot State a Claim for Misappropriation Under the DTSA

A&GC additionally assert that Count I should be dismissed because Plaintiffs cannot state a claim for misappropriation under the DTSA.  (Id. at 16.)  As explained in part above, the DTSA provides several ways to establish a misappropriation occurred:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
>
> > (i) used improper means to acquire knowledge of the trade secret;
> >
> > (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
> >
> > > (I) derived from or through a person who had used improper means to acquire the trade secret;
> > >
> > > (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
> > >
> > > (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret . . . .

18 U.S.C. § 1839(5).

In support of their argument, A&GC assert that "Plaintiffs plead absolutely no facts that demonstrate A&GC had possession of, or used, the [a]leged [t]rade [s]ecrets."  (Doc. No. 161 at 16.)  Instead, A&GC argue that Plaintiffs' allegations concerning them are entirely based on

A&GC's ownership of United States patents that claim priority to the initial '883 Korean application filed in 2006, which is purported to misappropriate Plaintiffs' trade secrets. (Id.) In response, Plaintiffs point to its allegations that A&GC "use" Plaintiffs' trade secrets by continuing to prosecute and obtaining several new patents that misappropriate Plaintiff's trade secrets. (Doc. No. 171 at 15.)

As discussed above, the TAC alleges that A&GC have acted throughout 2020 and 2021 to prosecute patents that embody Plaintiffs' trade secrets. (See Doc. No. 152 at ¶¶ 297-298.)  For example, when prosecuting their '716 patent, A&GC took the following actions: (1) "IDS Transmitted" in July 2020; (2) "Filed Response to Office Action" in January 2021; (3) "Interview with Examiner" in June 2021; (4) "Filed an Affidavit" in July 2021; and (5) "Filed Response to Office Action" in July 2021. (Id. at 298.)  The TAC also alleges that several of A&GC's new patents utilize Plaintiffs' trade secrets. (See id. at ¶¶ 304-313.)  For example, the TAC alleges that A&GC's '552 patent directly references its use of Plaintiff's trade secrets, stating "[m]icroarray gene expression data were obtained from the GeneExpress Oncology Datasuite$^{TM}$ of Gene Logic Inc." (See id. at ¶¶ 260-68.)  The TAC further alleges that A&GC's '716 patent, which is based on the '633 application filed by A&GC on March 28, 2018, relies on "the same 'standard genes' that came from [Plaintiffs'] Oncology Datasuite." (Id. at ¶ 310-311.)  Plaintiffs argue this activity fits within the Third Circuit's broad definition of "use" in Oakwood. (Id.); see also Oakwood, 999 F.3d at 910 (defining "use" of a trade secret broadly to encompass "all the ways one can take advantage of trade secret information to obtain an economic benefit, competitive advantage, or other commercial value, or to accomplish a similar exploitative purpose, such as 'assist[ing] or accelerat[ing] research or development").  At this stage in the proceedings, when the facts are viewed in the light most favorable to Plaintiffs, the Court agrees.  Taking actions to prosecute a

patent that allegedly misappropriates Plaintiffs' trade secrets qualifies as A&GC acting to obtain an economic or competitive advantage.  Similarly, since Plaintiffs allege that A&GC's '552 patent covers their GenesWell BCT product, a product which A&GC have admitted commercializing throughout the United States since 2017, this could be classified as A&GC taking advantage of a trade secret for an economic advantage.  (See Doc. No. 152 at ¶¶ 284, 291-96.)

A&GC next argue that, even if Plaintiffs have sufficiently pled "use" of Plaintiffs' trade secrets, they have not alleged facts demonstrating A&GC knew about the trade secret to satisfy the DTSA's knowledge requirement.  (Doc. No. 184 at 10.)  To prove misappropriation, the DTSA requires the misappropriating party to know or have reason to know the alleged trade secret was obtained through improper means.[10]  See 18 U.S.C. § 1839(5).  Despite A&GC's argument to the contrary, the TAC does allege A&GC had knowledge that Plaintiffs' trade secretes were obtained through improper means.  (Doc. No. 152 at ¶ 234.)  Specifically, Plaintiffs allege that "[o]n December 5, 2019, Ocimum contacted [A&GC] and counsel prosecuting their patents for an explanation of how they obtained a copy of the Oncology Datasuite."  (Id.)  Like Judge Burke in his Report and Recommendation, this Court finds that, "giving Plaintiffs the benefit of all reasonable inferences, the December 5, 2019 letter could plausibly have put A&GC on notice that any future unlicensed use of information drawn from the Oncology Datasuite would be a breach of secrecy that was violative of the law."  (Doc. No. 119 at 31.)  Because this December 5, 2019 letter satisfies the DTSA's knowledge requirement for any act of misappropriation by A&GC occurring after December 2019 and as the Court found in the preceding paragraph that A&GC used Plaintiffs' trade secrets throughout 2020 and 2021, Plaintiffs have plausibly stated a claim

---

[10] "Improper means" is defined to include "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  18 U.S.C. § 1839(6).

for misappropriation under the DTSA.  Accordingly, the Court will deny A&GC's Motion to Dismiss Plaintiffs' Third Amended Complaint (Doc. No. 160) as to Count I.[11]

### 2.   Defendants' Motions to Dismiss Plaintiffs' Claims in Count II Will Be Denied

In Count II, Plaintiffs assert a misappropriation of trade secrets claim under the Delaware Uniform Trade Secrets Act ("DUTSA") against all Defendants.  (See Doc. No. 152 at ¶¶ 446-457.) Defendant LG Chem argues Count II should be dismissed because Plaintiffs' claim is time barred by the DUTSA's three-year statute of limitations.  (Doc. No. 159 at 17.)  A&GC argue that Count II should be dismissed because Plaintiffs' claim is statutorily time barred as well as because Plaintiffs cannot state a claim for misappropriation under the DUTSA as to A&GC.  (Doc. No. 161 at 12, 16.)  The Court will address LG Chem and A&GC's arguments concerning the statute of limitations separately from A&GC's argument that Plaintiffs failed to state a claim for misappropriation.

### a.   LG Chem and A&GC's Arguments that Plaintiffs' Claim is Time Barred Under the Delaware Uniform Trade Secrets Act ("DUTSA")

LG Chem and A&GC both argue that Plaintiffs' claim in Count II should be dismissed as time barred under the DUTSA's statute of limitations.  (See Doc. No. 159 at 17; Doc. No. 161 at

---

[11]  A&GC make two additional arguments in support of their contention that Plaintiffs have not stated a claim for misappropriation under the DTSA: (1) A&GC could not have been involved in any act of misappropriation that allegedly occurred before their corporate existences starting in 2007 and 2011, respectively; and (2) Plaintiffs' claim under the DTSA is precluded because the DTSA was not enacted until May 11, 2016 and does not apply retroactively. (Doc. No. 161 at 18, 20.)  Because the Court has found that Plaintiffs have sufficiently alleged acts of misappropriation attributable to A&GC as recently as 2020 and 2021, the Court need not further address these arguments.  See also Teva Pharmaceuticals USA, Inc. v. Sandhu, 291 F. Supp. 3d 659, 674 (E.D. Pa. 2018) ("Because the misappropriated trade secrets were acquired and used before the enactment of the DTSA does not mean the statute does not apply when use continued after enactment.")

12.)  Like the DTSA, claims under the DUTSA must be brought within three years after the misappropriation "is discovered or by the exercise of reasonable diligence should have been discovered."[12]  De. Code Ann. Tit. 6, § 2006.  "Under Delaware law, the statute of limitations begins to run when a plaintiff has (1) actual notice of the basis for the cause of action or (2) has inquiry notice—i.e., notice of facts from which the basis for the cause of action could have been discovered by the exercise of reasonable diligence."  RoboticVISIONTech, 2024 WL 1299691, at *2.  Also like the DTSA, Delaware courts recognize three tolling doctrines that that operate to pause the running of a statute of limitations until a plaintiff discovers "facts constituting the basis of the cause of action <u>or</u> the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts."[13]  <u>See</u> <u>Coleman</u>, 854 A.2d at 842.

Here, both LG Chem and A&GC put forth identical arguments in support of their contentions that Plaintiffs' DUTSA claims are time barred as they did when arguing Plaintiffs' DTSA claims were time barred.  (<u>See</u> Doc. No. 159 at 17-25; Doc. No. 161 at 12-15.)  This Court found above that Plaintiffs have plausibly alleged the applicability of the tolling doctrine of fraudulent concealment to stay the statute of limitations on their DTSA claim against LG Chem. Because Delaware's tolling doctrines remain applicable to the DUTSA, the Court concludes that

---

[12]  Under the DUTSA, a continuing violation constitutes a single claim of misappropriation.  <u>Id.</u> When determining the period during which the statute of limitations began to run, "[t]he key consideration under the discovery rule is the factual, not the legal, basis for the cause of action. <u>VLIW Tech., LLC v. Hewlett-Packard Co.</u>, No. Civ.A. 20069, 2005 WL 1089027, at *13 (Del. Ch. May 4, 2005).  As such, "[i]t does not matter if an aggrieved party does not realize that the use legally constituted a misappropriation of trade secrets [. . .] as long as the party knew <u>the facts</u> which could give rise to such a claim."  <u>Id.</u> (internal quotation marks, citations, and brackets omitted) (emphasis in original).

[13]  For further discussion on the three tolling doctrines recognized by Delaware courts, see the Court's discussion in Section IV(A)(1)(b).

the tolling doctrine of fraudulent concealment also applies to Plaintiffs' claim against LG Chem under the DUTSA. Similarly, this Court already found that Plaintiffs have sufficiently alleged acts of misappropriation attributable to A&GC within the DTSA's statute of limitations period. Because the DTSA and DUTSA have identical statutes of limitation, the Court reaches the same conclusion with respect to the DUTSA's statute of limitations. Accordingly, the Court will deny LG Chem and A&GC's Motions to Dismiss Plaintiffs' Third Amended Complaint (Docs. No. 158, 160) as to Count II.

### b.   A&GC's Argument that Plaintiffs Do Not Allege a Claim for Misappropriation Under the DUTSA

A&GC next argue that Plaintiffs do not allege a claim for misappropriation as to A&GC under the DUTSA. (Doc. No. 161 at 16.) Similar to the DTSA, with regard to the DUTSA, there are four elements of a trade secret misappropriation claim: (1) a trade secret exists; (2) the trade secret was communicated to the defendant; (3) the communication was made pursuant to an understanding, express or implied, that the secrecy of the information would be maintained; and (4) the trade secret has been misappropriated within the meaning of that term as defined in DUTSA. Alarm.com Holdings, Inc. v. ABS Cap. Partners Inc., No. 2017-0583-JTL, 2018 WL 3006118, at *6-7 (Del. Ch. June 15, 2018); Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC, No. 7866-VCP, 2014 WL 897223, at *13 (Del. Ch. Mar. 5, 2014). The DUTSA defines "misappropriation," in relevant part, as the following:

> a. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> b. Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> 1. Used improper means to acquire knowledge of the trade secret; or

    2. At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade [secret] was:

        A. Derived from or through a person who had utilized improper means to acquire it;

        B. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

        C. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use[.]

Del. Code Ann. tit. 6, § 2001(2).  Further, it defines "improper means" to "include theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  Del. Code Ann. tit. 6, § 2001(1).

In light of the similarity between the DTSA and the DUTSA, the parties' arguments for and against dismissal of Plaintiffs' DUTSA claim are identical to those arguments they made when arguing for and against the dismissal of Plaintiffs' DTSA claim.  For the same reasons provided above with regard to the DTSA claim, the Court concludes that Plaintiffs have plausibly stated a claim for misappropriation as to A&GC under the DUTSA.  Accordingly, the Court will deny A&GC's Motion to Dismiss Plaintiffs' Third Amended Complaint (Doc. No. 160) as to Count II.

### 3. LG Chem's Motion to Dismiss Plaintiffs' Claim in Count III Will Be Denied

In Count III, Plaintiffs assert a breach of contract claim under Delaware law only against LG Chem.  (See Doc. No. 152 at ¶¶ 458-480.)  Delaware law imposes a three-year statute of limitations on breach of contracts claims.  Del. Code Ann. Tit. 10, § 8106.  A breach of contract claim "accrues at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action." Erisman v. Zaitsev, C.A. No. 2020-0903-JRS, 2021 WL 6134034, at *12 (Del. Ch. Dec. 29, 2021) (internal quotation marks and citation omitted).  However, Delaware courts recognize three tolling doctrines that operate to pause the running of a statute of limitations until a plaintiff

discovers "facts constituting the basis of the cause of action <u>or</u> the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts."[14]  <u>See</u> <u>Coleman</u>, 854 A.2d at 842.

In its Brief, LG Chem argues Count III should be dismissed because the actions underlying Plaintiffs' breach of contract claim "accrued at the latest upon publication of the [2009] article or at the time of filing for the ['279] patent application."  (Doc. No. 159 at 12-13.)  As LG Chem claims, because Plaintiffs filed suit against LG Chem on December 5, 2019, their failure to allege "any facts arising after December 5, 2016" necessarily means Plaintiffs' breach of contract claim is time barred.  (<u>Id.</u> at 14.)  However, in making this argument, LG Chem merely asserts the same arguments it previously made on Counts I and II as to why tolling is not available.  (<u>See</u> <u>id.</u> at 17.)  For the same reasons the Court found LG Chem's arguments on tolling lacking as to Count I and II, it again finds that these arguments fail as to Count III.  Therefore, the Court again concludes that Plaintiffs have plausibly demonstrated, as noted above, the applicability of the tolling doctrine of fraudulent concealment to their breach of contract claim.  Accordingly, the Court will deny LG Chem's Motion to Dismiss Plaintiffs' Third Amended Complaint (Doc. No. 158) as to Count III.

**B.    A&GC's Motion to Dismiss for Lack of Personal Jurisdiction Will Be Denied**

A&GC also argue that Counts I and II should be dismissed for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).  (Doc. No. 161 at 21.)  In the TAC, Plaintiffs allege that this Court has personal jurisdiction over A&GC pursuant to the "federal long arm

---

[14]   The three tolling doctrines recognized by Delaware law are (1) the doctrine of inherently unknowable injuries, (2) the doctrine of fraudulent concealment, and (3) the doctrine of equitable tolling.  <u>Ausikaitis ex rel. Masimo Corp. v. Kiani</u>, 962 F. Supp. 2d 661, 674 (D. Del. 2013).

statute" contained in Federal Rule of Civil Procedure 4(k)(2).[15]   (Doc. No. 152 at ¶ 3.); Britax Child Safety, Inc. v. Nuna Int'l B.V., 321 F. Supp. 3d 546, 553 (E.D. Pa. 2018).   Under Rule 4(k)(2), a federal court may "exert jurisdiction over a foreign defendant where the defendant lacks sufficient contacts in a single state to bring it within the reach of the state's long arm statute, yet has enough contacts with the United States as a whole to make jurisdiction constitutional."   Saudi v. Acomarit Maritimes Services, S.A., 114 F.App'x 449, 455 (3d Cir. 2004).   "Therefore, to establish personal jurisdiction, there must be: (1) a claim arising under federal law; (2) the defendant must be beyond the jurisdictional reach of any state court of general jurisdiction; and (3) the defendant must have sufficient contacts with the United States so that the court's exercise of personal jurisdiction over the defendant comports with the due process requirements of the Constitution or other federal law."   Id.   Here, A&GC take issue with the first and third requirements.[16]

First, A&GC argue that as the only federal claim Plaintiffs have alleged against A&GC is their DTSA claim and because A&GC assert Plaintiffs DTSA claim against A&GC fails, this "lack of a federal claim precludes jurisdiction over A&GC." (Doc. No. 161 at 21.)  However, this Court already found that Plaintiffs have sufficiently alleged a misappropriation claim under the DTSA

---

[15] Federal Rule of Civil Procedure 4(k)(2), titled "Federal Claim Outside State-Court Jurisdiction," states:

(2) For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
(B) exercising jurisdiction is consistent with the United States Constitution and laws.

Fed. R. Civ. P. 4(k)(2).

[16] A&GC are both South Korean corporations with principal places of business in Seoul, South Korea. (Doc. No. 152 at ¶¶ 4-5.)  Accordingly, they are both "beyond the jurisdictional reach of any state court of general jurisdiction." See Saudi, 114 F.App'x at 455.

against A&GC.  Therefore, Plaintiffs have brought a claim arising under federal law against A&GC and A&GC's argument to the contrary is moot.

Next, A&GC argue that the exercise of jurisdiction over them would not comport with due process requirements because "Plaintiffs' claims do not arise out of the alleged jurisdictional contacts" and the Court's exercise of jurisdiction over A&GC would be unreasonable.  (Id. at 22.) "[I]n deciding whether due process permits the exercise of personal jurisdiction under Rule 4(k)(2), [a court] must consider whether (1) defendant has purposefully directed its activities at residents of the forum, (2) the claim arises out of or relates to the defendant's activities with the forum, and (3) assertion of personal jurisdiction is reasonable and fair."  Touchcom, Inc. v. Bereskin & Parr, 574 F.3d 1403, 1416 (Fed. Cir. 2009) (characterizing the jurisdictional analysis under Federal Rule of Civil Procedure 4(k)(2) as a specific jurisdiction analysis) (internal quotations omitted).  Plaintiffs counter A&GC's first due process argument by citing to several paragraphs in the TAC that purport to establish a "mountain of jurisdictional contacts" that arise out of or relate to Plaintiffs' claims against A&GC.  (Doc. No. 171 at 22.)  Among these alleged contacts are the following:

- In June 2018, all named inventors who obtained access to Ocimum's Oncology Datasuite through LG Chem assigned their interest in the '660 patent to Abion and Gencurix.

- Gencurix has continued to seek and obtain patents throughout the world, including the United States, that misappropriate Ocimum's trade secrets.

- For example, on January 10, 2019, within the limitations period here, U.S. patent application 16/129,206 ("the '206 application") was published as U.S. Patent Publication 2019/0012429 in the name of Abion, Inc. and Gencurix Inc.

- The '206 application issued as U.S. Patent No. 11,107,552.

- Like prior patents currently owned by Abion and Gencurix, this ['552] patent makes express use of Ocimum's trade secrets . . .

38

- Gencurix has filed for and obtained trademark protection from the United States government (USPTO) for GenesWell BCT (Registration Number 5187972, Serial Number 86930539) [a product alleged to misappropriate Plaintiffs' trade secrets].

- Abion and Gencurix are continuing their patent prosecution activities after receiving notice from Ocimum in December 2019 that their patents misappropriate Ocimum's trade secrets.

- In April of 2018, Gencurix attended the American Association of Cancer Researchers in San Diego, California to promote GenesWell BCT and present information regarding its utility to breast cancer patients.

(Doc. No. 152 at ¶¶ 208, 258, 260, 261, 264, 285, 297, 347.)  As Plaintiffs aver, each of these alleged contacts with the United States could qualify as "use" of Plaintiffs' trade secrets under the Third Circuit's broad definition in Oakwood.  (See Doc. No. 171 at 22.)  Therefore, Plaintiffs have sufficiently alleged that their claims arise out of A&GC's alleged jurisdictional contacts.

Finally, to support their second due process argument that the Court's exercise of jurisdiction over A&GC would be unreasonable, A&GC assert that the alleged act of misappropriation occurred almost twenty years ago.  (Doc. No. 161 at 23.)  Moreover, A&GC argue that they "do not have, and are not alleged to have, any contact with the U.S. beyond the ownership of [patents relating back to the initial 2006 Korean Patent Application] and the non-US specific acts relating to the practice of the [methods covered by A&GC's patents]."  However, this Court just found that Plaintiffs' TAC sufficiently alleged that their claims arise out of A&GC's alleged jurisdictional contacts.  The same purported jurisdictional contacts apply to this argument as well.  A&GC's alleged acts of "obtaining U.S. patents on misappropriated products [namely, GeneWells BCT], obtaining U.S. trademarks on these products, seeking USFDA approval to sell these products in the United States . . . and promoting these products at trade shows in the United States" are enough jurisdictional contacts to make the exercise of jurisdiction by this Court reasonable.  (Doc. No. 171 at 22 (internal citations omitted).)  Therefore, accepting Plaintiffs'

allegations as true and construing disputed facts in favor of Plaintiffs, this Court concludes that Plaintiffs have sufficiently pled a <u>prima facie</u> case of jurisdiction to defeat A&GC's Motion to Dismiss.  Accordingly, the Court will deny A&GC's Motion to Dismiss Plaintiffs' Third Amended Complaint for lack of personal jurisdiction (Doc. No. 160).

###       C.       A&GC's Motion to Strike Will Be Denied

Finally, A&GC move to strike paragraphs 11, 21, 168-169, 196, 200-202, 209-211, 215, 219-220, 222-225, 227-233, 235, 245, 253-254, 263-264, 469, 478-479, 450-454, and 435-438 from Plaintiffs' TAC.  (Doc. No. 161 at 24.)  A&GC base their argument on the contention that paragraph 235 of the TAC allegedly pleads information garnered during a settlement discussion and that this paragraph forms the basis of Plaintiffs claims against A&GC, which are laid out in the other paragraphs A&GC request the Court to strike.  (Doc. No. 161 at 24-25.)  A&GC support this contention by citing to Federal Rule of Evidence 408 which "precludes reliance on 'conduct or a statement made during compromise negotiations about the claim' as evidence 'to prove or disprove the validity or amount of a disputed claim.'"  (<u>Id.</u> (quoting Fed. R. Evid. 408).)  Plaintiffs, however, deny any such settlement discussion took place.  (Doc. No. 171 at 25.)

Even assuming, arguendo, that the settlement discussions did occur, the Court will decline to strike paragraph 235 or the other paragraphs from the TAC.  Paragraph 235 states that "[d]uring a telephone conversation on June 2, 2020, [A&GC] told Ocimum that their usage of Ocimum's proprietary Oncology Database was facilitated by Sang Seok Koh, a former or current employee of LG Chem."  (Doc. No. 152 at ¶ 235.)  While courts have stricken references to settlement discussions alleged in complaints, Federal Rule of Evidence 408 does not govern pleadings and does not necessitate all references to settlement discussions be stricken.  <u>See</u> <u>Steak Umm Co., LLC v. Steak 'Em Up, Inc.</u>, No. 09–2857, 2009 WL 3540786, at *3 (considering whether to strike a

reference to settlement discussions from a complaint and concluding that "[w]hile the reference to settlement discussions may be inadmissible, it is not so irrelevant as to warrant striking any part of [the] complaint.")  Because the allegations in paragraph 235 are not immaterial to Plaintiffs' claims in that they help explain how A&GC obtained Plaintiffs' trade secrets, the Court will decline to strike paragraph 235 from Plaintiffs' TAC.

Similarly, the Court will decline to strike paragraphs 11, 21, 168-169, 196, 200-202, 209-211, 215, 219-220, 222-225, 227-233, 245, 253-254, 263-264, 469, 478-479, 450-454, and 435-438 from the TAC.  These paragraphs allege, in so many words, that A&GC used Plaintiffs' trade secrets and that A&GC gained access to these trade secrets through LG Chem, including through LG Chem employee Sang Seok Koh.  (See Doc. No. 152 at ¶¶ 11, 21, 168-169, 196, 200-202, 209-211, 215, 219-220, 222-225, 227-233, 245, 253-254, 263-264, 469, 478-479, 450-454, 435-438.) For example, paragraphs 200-202, 209-211, and 215 describe Plaintiffs' inference as to how A&GC came to possess Plaintiffs' trade secrets.  Specifically, LG Chem is alleged to have provided a copy of Plaintiffs' trade secrets to every named inventor on the '660 patent and every researcher on the 2009 article.  (Id. at ¶ 201.)  As both Abion's CEO, Young Kee Shin, and then LG Chem employee Sang Seok Koh were named inventors and researchers on the '660 patent and 2009 article respectively, it is inferred that during the research for these two publications, A&GC, through Abion's CEO, gained access to Plaintiffs' trade secrets.  (Id. at ¶ 200.)  Because these allegations are material to Plaintiffs' claims against A&GC in that they again help explain how A&GC obtained Plaintiffs' trade secrets, the Court will decline to strike paragraphs 11, 21, 168-169, 196, 200-202, 209-211, 215, 219-220, 222-225, 227-233, 245, 253-254, 263-264, 469, 478-479, 450-454, and 435-438 from the TAC.  Accordingly, the Court will deny A&GC's Motion to Strike (Doc. No. 160).

## V.    CONCLUSION

For the foregoing reasons, LG Chem's Motion to Dismiss Plaintiffs' Third Amended Complaint (Doc. No. 158) and A&GC's Motion to Dismiss Plaintiffs' Third Amended Complaint (Doc. No. 160) will be denied.  An appropriate Order follows.